**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PEMBROKE PINES PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INTEGER HOLDINGS CORPORATION, JOSEPH W. DZIEDZIC, DIRON SMITH, and PAYMAN KHALES,<br><br>Defendants. | No. 1:25-cv-10251-JSR<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT .......... 2

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 7

A. Lead Plaintiff .......... 7

B. Defendants .......... 8

IV. OVERVIEW OF THE FRAUD .......... 9

A. Company Background .......... 9

B. Leading Up To The Class Period, Integer Increasingly Turned To Electrophysiology Products, And Specifically Sophisticated PFA Medical Devices, To Drive Growth .......... 11

C. During The Class Period, Defendants Repeatedly Touted The Company's "1.5x Market Growth Rate" In EP Products Fueled By PFA "Tailwinds" .......... 15

D. Integer Announces Dziedzic's Sudden Retirement, And Dziedzic Cashes Out, Selling Virtually All Of His Integer Stock—$42 Million Worth—In Just One Day, While Concealing That Integer's PFA Business Had Cratered .......... 19

E. The Truth Emerges .......... 21

F. Plaintiff's Investigation Confirms That Defendants Knew Integer's Manufacturing Failures And Medtronic's Falling Demand Had Devastated The Commercial Launch Of Its Most Important PFA Product, Reversing The Company's Growth Prospects .......... 27

1. Former Employees Confirm That, As Of The Start of The Class Period, Integer Was Already Experiencing Severe Manufacturing Delays and Deficiencies For Its Most Important PFA Product .......... 28

2. Former Employees Confirmed That Integer's Most Senior Officers Knew And Were Regularly Updated On The Severe Manufacturing Delays and Deficiencies Plaguing Its Critical Medtronic PFA Product .......... 34

3. Former Medtronic Employees Confirmed That Integer Played No Role In Medtronic's Second Generation PFA Device, Affera, Which Was Rapidly Overtaking PulseSelect As Medtronic's Main PFA Product .......... 39

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .......... 42

A. Q2 2024 Earnings Release And Conference Call .......... 42

B. 2024 Wells Fargo HealthCare Conference ... 45

C. Q3 2024 Earnings Release And Conference Call ... 46

D. 2024 Piper Sandler 36th Annual Healthcare Conference ... 49

E. Q4 And FY 2024 Earnings Release And Conference Call ... 50

F. 2025 Raymond James Institutional Investors Conference ... 52

G. 2025 KeyBanc Capital Markets Healthcare Forum ... 53

H. Q1 2025 Earnings Release And Conference Call ... 54

I. May 2025 Bank of America Healthcare Conference ... 55

J. June 2025 Truist Securities MedTech Conference ... 57

K. Q2 2025 Earnings Release and Conference Call ... 58

L. 2025 Wells Fargo Healthcare Conference ... 60

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ... 60

VII. LOSS CAUSATION ... 65

VIII. PRESUMPTION OF RELIANCE ... 68

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ... 69

X. CLASS ACTION ALLEGATIONS ... 70

XI. CLAIMS FOR RELIEF ... 72

XII. PRAYER FOR RELIEF ... 76

XIII. JURY DEMAND ... 77

Lead Plaintiff Pembroke Pines Pension Fund for Firefighters and Police Officers ("Plaintiff" or "Lead Plaintiff"), by and through the undersigned counsel, brings this securities class action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Integer Holdings Corporation ("Integer" or the "Company"), Joseph W. Dziedzic, Diron Smith, and Payman Khales (the "Individual Defendants," and together with Integer, the "Defendants"), on behalf of all persons and entities that purchased Integer common stock between July 25, 2024 and October 22, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Lead Counsel's investigation included, among other things: (a) interviews with former employees of Integer and one of the Company's largest customers, Medtronic plc ("Medtronic"); (b) review and analysis of public filings made by Integer with the Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications disseminated by Defendants and other parties; (d) review of news articles, shareholder communications, conference calls, and postings on Integer's website; and (e) review of other publicly available information concerning the Company and the Individual Defendants.

Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

## I. PRELIMINARY STATEMENT

1. Integer is a contract medical device manufacturer that builds finished medical devices and components for major medtech companies like Medtronic and Boston Scientific. During the Class Period (July 25, 2024 through October 22, 2025), Integer's most promising growth area was electrophysiology ("EP")—a category of cutting-edge devices for diagnosis and treatment of heart arrhythmias. Within the EP field, a new technology called pulsed field ablation ("PFA"), which employs short, high-energy electrical pulses to treat atrial fibrillation, drove the Company's growth expectations.

2. Throughout the Class Period, Defendants made a series of uniformly positive statements about the Company's critically important EP business and its burgeoning PFA manufacturing program. Defendants repeatedly touted the "***tailwind***" that Integer's PFA manufacturing business was creating for the Company, with sales growth "***driven by new product ramps in electrophysiology***," thus enabling the Company to "***continue to outgrow the market***" in EP. Defendants represented that this growth was driven by Integer's unique manufacturing prowess, which enabled customers to "***accelerate the introduction of pulsed field ablation***" products.

3. Significantly, when analysts expressed concern about whether Integer's growth could be at risk because it was *overly* reliant on EP or PFA products, Defendants assured investors that the opposite was true. Indeed, Integer's CEO, Defendant Dziedzic, asserted that while "electrophysiology is an exciting, high-growth market" for the Company, he did not "expect any one product or end market to be the single biggest driver or materially change the company outlook." Moreover, Defendants reinforced this narrative by assuring investors that they had "***tremendous visibility***" into demand, emphasizing that Integer's "***very strong order book***" meant that executives knew exactly what orders looked like many months or even years into the future—

an important assurance given that Defendants refused to disclose the specific customers or products by name that were underpinning Integer's purported demand.

4. Analysts and investors relied on these representations, emphasizing that "PFA is a fast-growing platform on which the company's considerable vertical integration is a strength" and thus finding that "PFA will be a solid multi-year tailwind for the company." Moreover, analysts fully accepted management's representations that Integer's growth was not at risk from over-concentration in EP or PFA, expressly noting that "ITGR indicated no single product or category will be an outsized driver of growth." Fueled by Defendants' statements, Integer's stock price reached a Class Period high of $144.36 per share on January 28, 2025.

5. Defendants took full advantage of their misrepresentations. Specifically, during the Company's Q1 2025 earnings call on April 24, 2025, Defendant Dziedzic emphasized that "***electrophysiology does continue to outgrow the markets very nicely***" and called it a "***strong contributor to our growth***," while touting PFA in particular as an "***opportunity for us***" given that Integer was purportedly manufacturing more and more PFA devices and components for major customers. The same day, the Company issued a separate press release announcing that Defendant Dziedzic had suddenly decided to retire effective October 24, 2025, at age 57. Integer gave no further explanation for the retirement.

6. Just one week later, on May 1, 2025, Dziedzic capitalized on Defendants' fraud. On that date, Dziedzic ***cashed out of Integer***, selling virtually all of his Company stock—almost 340,000 shares, comprising ***88%*** of the shares he owned—in a ***single day***, for proceeds of nearly $42 million. After not selling a single share for years prior to the Class Period, Dziedzic made this massive one-day sale at artificially inflated prices between $122.45 and $126.18 per share—prices that were near Integer's Class Period highs—receiving a windfall net profit of almost $39 million.

And strikingly, further underscoring the suspicious nature of Dziedzic's sale, the transaction was not made pursuant to a Rule 10b5-1 trading plan.

7. Unbeknownst to investors, at the time Defendant Dziedzic made these insider sales, he knew full well that Integer's PFA business growth—and, in turn, the growth of the Company's entire electrophysiology business—was already collapsing. Specifically, as former senior Integer employees directly responsible for the Company's PFA products confirmed, Integer's PFA business was heavily dependent on a single product: Medtronic's PulseSelect PFA device, for which Integer was the sole manufacturer, and which was made exclusively at the Company's Juarez, Mexico facility. These former employees confirmed that by the start of the Class Period, Integer was experiencing such profound manufacturing setbacks and delays that the Company was completely unable to manufacture PulseSelect devices at anything close to the volumes needed by Medtronic.

8. Furthermore, due to these deficiencies, the PulseSelect devices that Integer was able to manufacture were claimed by Medtronic to be riddled with defects, prompting Medtronic to return thousands upon thousands of the devices to Integer in late 2024 and early 2025—the vast majority of the PulseSelect devices produced by the Company during this time. Significantly, given these issues, by March 2025, Medtronic entirely stopped ordering new PFA devices from the Company, and shortly thereafter, Integer was forced to shut down its entire PulseSelect manufacturing line at its Mexico facility and fire over 100 employees. Thus, by the time Dziedzic made his massive $42 million sale of Integer stock, Defendants knew beyond a shadow of a doubt that demand for Integer's most important PFA product had evaporated.

9. Defendants never disclosed these highly material facts to investors. To the contrary, Defendants continued to repeat their assurances regarding Integer's EP and PFA business

throughout the Class Period. For example, on July 24, 2025, during the Company's Q2 2025 earnings call, Integer's COO, Defendant Khales, reiterated that Integer's EP business was "outperforming the market" and emphasized that PFA was "driving a lot of growth" and "giving us some tailwinds" due to the Company's "strong pipeline" and "good momentum in that space." Even as late as September 2025—just one month before the end of the Class Period—Khales continued to boast that there was "a lot of momentum in [the EP] space at the moment" for the Company, highlighting that this gave Integer a "tailwind in general" for its business and proclaiming: "net-net, we're positive on the PFA [] devices themselves."

10. It was not until October 23, 2025—the very day before Defendant Dziedzic was scheduled to retire—that Defendants finally disclosed the truth. After spending the better part of two years assuring investors that Integer's PFA business was booming and driving "above-market growth" for the Company, Defendants now admitted that the opposite was true. In reality, demand for Integer's PFA products had collapsed, and as a result, Defendants were forced to announce that they now expected reduced sales for the remainder of 2025 and ***no sales growth whatsoever*** in 2026.

11. Significantly, in direct contrast to Defendants' constant assurances that there was not "any one product or end market" that was "the single biggest driver or [would] materially change the company outlook," Defendants revealed that Integer's dramatic guidance reduction was attributable to poor demand for just three products—and primarily two unnamed EP products. Moreover, rather than providing a consistent "tailwind" for Integer's business—as Defendants had reiterated just weeks earlier—Defendants now admitted that cratering demand for Integer's EP products created a "3% to 4% ***headwind*** to [Integer's] total company sales for [2026]." Further, Khales made clear that the Company's poor outlook was directly attributable to these EP products,

stating: "[t]he headwinds that we are seeing is related to two [EP] products. . ." Indeed, the impact of this "slower" demand was so severe that the Company did not expect to return to "above market growth" until 2027 ***at earliest***.

12. Analysts reacted furiously, confronting Defendants with pointed questions about Integer's failure to disclose this information earlier. Tellingly, analysts repeatedly pressed Defendants to disclose which products and customers were at issue, but Defendants refused to disclose this information. Further, while Defendants claimed that they had not learned of the demand slowdown until the most recent quarter (Q3 2025), analysts rejected this explanation, citing Defendants' prior claims of how strong their "visibility" was into demand. For example, an Oppenheimer analyst emphasized that he was "struggling to reconcile" the Company's disclosures "versus the suddenness of the demand" falling off. Similarly, analysts were incredulous as to how the Company's most significant products could suddenly and simultaneously experience such a marked decline in demand. Indeed, when the Company was forced to concede that this was an "aberration" and "highly unusual," analysts bluntly questioned: "What just happened?"—while noting that it was "odd" that demand for multiple critical products would suddenly crater at the exact same time, concluding that "[c]learly there is some explaining that needs to be done." Likewise, Wells Fargo analysts excoriated Defendants and called out that they "did not flag any EP issues at our Healthcare Conference on Sept[ember] 8"—*i.e.*, just six weeks prior, when Khales falsely assured investors of Integer's continued PFA "tailwind."

13. On this news, Integer's stock price plummeted by nearly 33% in a single day, or $35.22 per share, from a closing price of $109.11 per share on October 22, 2025, to a closing price of $73.89 per share on October 23, 2025, on extraordinary trading volume. In total, Integer's stock lost more than $1.2 billion in market value due to Defendants' misrepresentations.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District, as the common stock that is the subject of this action is traded on the New York Stock Exchange ("NYSE") in this Judicial District.

17. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III. PARTIES

### A. Lead Plaintiff

18. Lead Plaintiff Pembroke Pines Pension Fund for Firefighters and Police Officers ("Pembroke Pines") is a pension plan that administers retirement, disability, and death benefits for Pembroke Pines, Florida's police officers and firefighters. Pembroke Pines manages approximately $1 billion in assets that it invests for the welfare of its members and their families. As reflected in its PSLRA certification, Lead Plaintiff purchased Integer common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**B. Defendants**

19. Defendant Integer is incorporated under the laws of Delaware, with its principal executive offices in Plano, Texas. Integer's common stock trades on the NYSE under the ticker symbol "ITGR."

20. Defendant Joseph W. Dziedzic ("CEO Dziedzic") was, at all relevant times, Chief Executive Officer ("CEO"), President, and Director of Integer.

21. Defendant Diron Smith ("CFO Smith") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Integer.

22. Defendant Payman Khales ("COO Khales") was, at all relevant times, Chief Operating Officer ("COO") of Integer.

23. During the Class Period, Defendants Dziedzic, Smith, and Khales, as senior executive officers and/or directors of Integer, were privy to confidential, proprietary and material adverse non-public information concerning Integer, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

24. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the

unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Integer's business.

25. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Integer's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Company's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. OVERVIEW OF THE FRAUD

### A. Company Background

27. Integer is one of the world's largest medical device contract manufacturers. Integer's customers are original equipment manufacturers ("OEMs") that develop medical devices

for regulatory approval and commercial distribution. These OEMs contract with Integer to manufacture either finished medical devices or specific components for devices.

28. Throughout the Class Period, the Company's manufacturing operations were organized into three product lines: Cardio & Vascular ("C&V"), Cardiac Rhythm Management & Neuromodulation ("CRM&N"), and Other Markets. C&V was by far the largest and most important segment for the Company, comprising approximately 60% of Integer's total revenue and the majority of its profits. The C&V segment produced a full range of components and finished devices used in various interventional procedures, including access and delivery systems used to navigate the vasculature during surgeries, a variety of catheter technologies, and clinical application products supporting procedures in interventional cardiology, structural heart, and electrophysiology or "EP." As discussed below, before and during the Class Period, Integer increasingly looked to EP devices to drive its growth—in particular, a new type of EP technology known as pulsed field ablation or "PFA."

29. Integer's overall performance was heavily dependent on a handful of large, multi-national medical device OEMs. Integer's largest customers were Medtronic, Abbott Laboratories, and Boston Scientific. Before and during the Class Period, these "Big 3" customers collectively accounted for nearly half of the Company's revenues. Accordingly, Integer's ability to maintain strong relationships with its "Big 3" OEM customers—including by providing sufficient quantities of high-quality, manufactured products and components to satisfy their orders—was critical to the Company's financial performance and future prospects. This was especially true for innovative medical devices in emerging, high-growth markets such as PFA.

30. Risk disclosures in Integer's securities filings underscored that the Company's financial condition and results of operations were closely tied to its relationships with its top three

customers. As Integer acknowledged in its February 20, 2025 Annual Report ("2024 Annual Report"), "[t]he loss of a significant amount of business from any large customer" could materially impact its financial condition and results of operations. Integer further warned in the 2024 Annual Report that Integer "depend[s] heavily on a limited number of customers, and if we lose any of them or they reduce their business with us, we would lose a substantial portion of our revenues."

31. Significantly, however, while Integer generally reported that Medtronic, Abbott, and Boston Scientific were its three largest customers (as required by the SEC), the Company did not disclose which specific products or components it made, or which customers it made them for. Accordingly, leading up to and during the Class Period, analysts and investors had to rely on Defendants' general representations about Integer's growth and success in overall product categories and markets, and did not have more detailed information about specific device or device component sales—including for PFA or other electrophysiology products.

### B. Leading Up To The Class Period, Integer Increasingly Turned To Electrophysiology Products, And Specifically Sophisticated PFA Medical Devices, To Drive Growth

32. Integer's largest segment, Cardio & Vascular, included electrophysiology devices. EP devices diagnose and map the heart's electrical activity to address common cardiovascular problems such as irregular heartbeats (cardiac arrhythmias), and in particular, atrial fibrillation, the most prevalent cardiac arrhythmia. According to the Company's annual reports, Integer had the technical capabilities and expertise to provide the full spectrum of EP products from components and subassemblies to finished devices.

33. Integer had been building its presence in the EP market for many years, but its reliance on EP products accelerated shortly before the Class Period as developments in technology moved the EP industry to more sophisticated and high-margin, pulsed field ablation products. Between 2023 and 2024, EP devices underwent a technological revolution. Integer's OEM

customers began to develop PFA devices that used brief, high-energy electrical pulses to treat atrial fibrillation. In turn, the medical industry became increasingly focused on integrating EP devices with PFA technologies to effectuate a more seamless cardiac procedure.

34. Integer's strategic entry into the PFA segment accelerated in 2024 as the technology achieved regulatory approvals and moved towards broad commercialization. In early 2024, Integer began touting PFA as a "targeted growth market" and key driver of revenue growth in reporting its financial results and in other public communications to investors. While Integer operated "behind the curtain" as a contract development and manufacturing organization ("CDMO"), and did not typically brand its own devices or publicly discuss its business with specific OEM customers, it held itself out as a key manufacturer of components, sub-assemblies, and finished devices for the leading PFA players in the industry. As 2024 progressed, Integer highlighted a revenue ramp from PFA products the Company was manufacturing for its OEM customers, telling investors that the Company was seeing "very strong" growth in its EP business driven by OEM customers' ramp and launch programs for PFA-related devices. For example, during the Bank of America Healthcare Conference on May 14, 2024, CEO Dziedzic emphasized that Integer "benefit[ed] significantly from electrophysiology procedure growth" and told investors that the burgeoning PFA market was "a tailwind" to EP growth.

35. Defendants further assured investors Integer was well-positioned to capitalize on the high-growth PFA market by repeatedly emphasizing the Company's "great visibility" into customer demand for all products and components, including PFA pipelines and multi-generation product development plans for its major OEM customers. Defendants supported their assertions of strong growth and excellent visibility in the EP segment, including PFA products, by repeatedly referencing the Company's "order books." Defendants told investors Integer maintained order

books containing all orders the Company had received—which generally encompassed the next 12-18 months, with longer lead times required for new product launches. According to Defendants, their order book (also referred to as "inventory" or "backlog") tracked granular metrics for each order, including the customer, product/SKU, price, quantity, and month of shipment. Defendants regularly updated investors on the total amount of the Company's order book as the Company and its OEM customers ramped up manufacturing and distribution of their medical devices, and then as customers worked through the inventory.

36. Indeed, at the beginning of the Class Period in July 2024, during Integer's Q2 2024 earnings call, Defendant Dziedzic repeatedly touted to investors that the Company had "not seen any material meaningful change in customer expectation," touting that Integer was "sitting here with almost $900 million of order book." Significantly, Dziedzic reinforced this message to the market by emphasizing that Defendants had "***tremendous visibility***" into the Company's future sales and growth, underscoring "the continued strength in the market" and the "continued high expectations of our customers for growth" precisely because Integer's customers supposedly "continue to place orders out further into the future." As Dziedzic stated:

> We have not seen any material meaningful change in customer expectation when you look out, I'll frame it into '25 and beyond, given your question about longer term. I mean sitting here with almost $900 million of order book . . . And I think that points to the continued strength in the market, continued high expectations of our customers for growth. They continue to place orders out further into the future, and it gives us tremendous visibility. So I think our customers remain very, very optimistic about their most exciting programs that they're bringing to the marketplace. And the overall market growth rates continue to show optimism. And I look to our order book and I look at the order patterns, very much in line with what we expected entering the year and they've continued.

37. As of the start of the Class Period, there were only two FDA-approved PFA Systems. Boston Scientific was first to the market with its FARAPULSE™ PFA System ("Farapulse"), which was approved for commercial use in Europe in 2021 and in the United States

in January 2024. Next, Medtronic's PulseSelect™ Pulsed Field Ablation system ("PulseSelect") was approved in Europe and the United States in November and December 2023, respectively, and was launched in the first half of 2024. Thus, Medtronic's PulseSelect—which was manufactured by Integer (unbeknownst to investors)—was the earliest large-scale competitor to Boston Scientific's Farapulse. As discussed below, once PulseSelect received regulatory approval and was ready for widespread commercial launch, Medtronic looked to Integer to provide large volumes of the product to satisfy end-user demand.

38. Accordingly, leading up to the Class Period, investors were laser-focused on the burgeoning PFA industry as a major driver of Integer's future growth, and viewed the Company as well-positioned to capitalize based on its relationships with the largest PFA players. For example, a February 23, 2024 Piper Sandler report noted that Integer's alignment with the fastest growing areas of medtech "including [PFA]" should "buoy the top-line for years to come," underlining that "PFA was a hot topic discussed in nearly every meeting" and that "[t]he company has broad exposure to this space and is manufacturing for most (if not all) of the leading players."

39. Similarly, in an April 8, 2024 report headlined, "ITGR: Checking the Pulse on Its PFA [Opportunity]," KeyBanc emphasized that Integer was "well positioned" to benefit from the growing PFA market due to its "vertical integration," "ability to accelerate customer speed to market," and ability to "provide more cost-efficient production and assembly, given its scale." KeyBanc also highlighted Integer's involvement in the "ongoing rollout of early-gen PFA products" because several of its customers, including Medtronic, were major players in the field. KeyBanc explained that "[a]t this point, there are only two [PFA] products with U.S. FDA approval (MDT's PulseSelect and BSX's FARAPULSE) and both are in early stages of commercialization,"

adding that "[o]ver the next few years, several additional platforms are expected to come to market and we believe ITGR is involved with the vast majority."

40. Likewise, a May 30, 2024 Truist report highlighted the "solid investor interest" in Integer due to its growing PFA business. Truist underscored the market's "spotlight" on Integer's performance in the PFA field, reporting that "PFA is one of the more exciting and closely watched new product cycles in MedTech and ITGR's growing exposure to the electrophysiology (EP) supply chain, including incorporation into PFA product development, has put the spotlight on the potential for this exciting new category to drive increased momentum for ITGR." Truist cited Integer's strong relationships with the major players in the field, and added that while the market had no way of knowing for certain which OEMs Integer was working with on PFA, it was nonetheless the case that "based on our conversations with ITGR mgmt, we think its safe to assume that ITGR has (or will have) some involvement with all major anticipated PFA players."

### C. During The Class Period, Defendants Repeatedly Touted The Company's "1.5x Market Growth Rate" In EP Products Fueled By PFA "Tailwinds"

41. The Class Period begins on July 25, 2024, when Integer announced strong financial results for the second quarter of 2024, which the Company attributed, in large part, to new product ramps in electrophysiology. In the accompanying earnings conference call, Defendants advanced a narrative that they continued through the end of the Class Period—namely, that Integer was consistently reporting strong financial performance largely due to the "1.5x … market growth rate" in the EP business, driven by a "tailwind" from the emerging, high-growth PFA market.

42. For example, during the Q2 2024 earnings conference call, a Piper Sandler & Co. analyst questioned CEO Dziedzic on the Company's "direct exposure to the growth" of the PFA category over the next several years and whether Integer's PFA-related growth would be "dramatic." In response, Dziedzic highlighted the Company's "strong visibility" into a "pipeline"

of "multi-generation [PFA] product development plans," including "one's we're on" and "ones we're working to get on," which would provide a "tailwind" to Integer's growth. To provide further assurance regarding the Company's growth trajectory, Defendants also reaffirmed their "very strong order book" that provided "great" and "tremendous" "multiyear visibility" into customer demand for new products and continued sales growth in 2024 and well into 2025. Meanwhile, Dziedzic assured the market that even though Integer was outperforming the EP market and was well-positioned to capitalize on emerging PFA technologies, Integer was diversified enough that it was not solely dependent on EP or PFA for its growth, *i.e.*, "no one part of our business or one program is going to materially meaningfully drive the company."

43. Analysts relied on Defendants' statements, citing Integer's broad exposure to the emerging PFA market as a key growth driver for the Company. For example, on July 25, 2024, Piper Sandler noted that a "Key Takeaway" from the earnings call was that "[m]anagement emphasized that it has good visibility into its order book" for C&V products and "exposure to an entire PFA case (including diagnostics)," reporting that it was "glad to hear that the company will benefit from the PFA tailwind in the coming quarters." Similarly, Truist emphasized PFA as a "growth driver" for Integer, commenting that "Mgmt. continues to see Pulsed Field Ablation (PFA) as a tailwind without a significant insourcing threat," and that "[t]he company's PFA order book reflects strong customer demand in ablation as well as across the access and diagnostic spaces."

44. Moreover, analysts took reassurance from Defendants' claims that their growth was not overly dependent on a single PFA product or market. Truist reported that while Integer has "high content on several PFA platforms" (meaning that Integer was believed to be manufacturing multiple components for numerous different PFA products), there was "no single product area meaningfully driving total company sales." Wells Fargo similarly reported that "ITGR continues

to expect PFA to help drive growth, but reiterated that no single category will be material to the top line."

45. Throughout the remainder of the Class Period, during virtually every quarterly earnings call and investor conference, Defendants continued to repeatedly tout the Company's above-market performance in EP, driven by new product ramps in PFA, and touted the strong future growth they expected PFA to provide for the Company. For example, on October 24, 2024, during Integer's 3Q 2024 earnings call, Defendant Dziedzic reaffirmed that the Company's "electrophysiology business continues to outperform the market," confirmed that Integer was "still growing 1.5-ish times the end market growth rate," and emphasized that Defendants expected EP growth "to continue to accelerate as more and more products come to market." Dziedzic boasted that Integer was well positioned to benefit from continued growth in the EP market given its broad footprint and vertical integration, again singling out PFA as a "tailwind for the company." And, once again, Dziedzic silenced concern that Integer depended too much on PFA or EP to drive growth, telling investors that EP was only "one of many growth factors for [Integer]" and that no "one product or end market" would "materially change the company outlook."

46. Following the call, Piper Sandler issued a report again identifying PFA as "a big talking point with the company," and opining that 3Q results reflected "only the beginning of the company's PFA ramp" and "given ITGR believes they can grow 1.5x the end-markets they play in, we believe PFA will be a solid multi-year tailwind for the company." Piper Sandler analysts similarly repeated Defendants' assurance that PFA was a "tailwind" driving the Company's performance, and Truist analysts highlighted that management expects EP growth "to accelerate as its clients' Pulsed Field Ablation businesses scale."

47. As the Class Period progressed into 2025, the PFA market became increasingly competitive, as major OEMs obtained or filed applications for regulatory approval of PFA devices with increasingly advanced technologies and capabilities. Medtronic, in particular, received FDA approval of its second generation PFA device, Affera, in October 2024, which had superior technologies and capabilities compared to its first-generation PulseSelect system. Meanwhile, in late 2024, Johnson & Johnson received FDA approval for its VARIPULSE™ Platform, the first PFA system with integrated 3D mapping using the company's proprietary technologies that allowed for procedures with minimal-to-zero radiation exposure. And in early 2025, Abbott Laboratories obtained approval from European regulators (and in mid-2025 sought FDA approval) of its Volt™ Pulsed Field Ablation System.

48. Notwithstanding these competitive dynamics, Defendants continued to assure investors that the Company's broad-based manufacturing of EP and PFA devices and components for major medtech companies was an ongoing "tailwind" for the business. For example, on April 24, 2025, Integer reported financial results that included a 17% increase in Cardio & Vascular sales, which the Company reported was "driven by new product ramps in electrophysiology and acquisitions." During the accompanying 1Q 2025 earnings call, CEO Dziedzic boasted that "electrophysiology does continue to outgrow the markets very nicely" and that PFA "continues to be a strong contributor to our growth." Dziedzic crowed that despite the increasingly competitive market dynamics in PFA, Integer's "above the market" growth was sustainable and Integer was "confident" in its "ability to deliver strong sales growth, given [its] high visibility to customer demand, including ramping programs in high-growth markets." Indeed, when an analyst asked about the Company's "backlog trend," CEO Dziedzic pointed to the Company's approximately

$800 million "order book" as providing a "fixed guarantee" for orders through at least the end of 2025, which provided "excellent visibility" for revenues from PFA product ramps.

49. Analysts again relied on Defendants' reassurances that Integer continued to occupy a leading position in the increasingly crowded PFA space. For example, an April 24, 2025 Piper Sandler report attributed the Company's better-than-expected first quarter results to "new product ramps in EP," added that it expected the EP growth to continue "given the company's broad presence across the ablation market and long runway for continued growth," and took comfort in the Company's "strong order book" which provided "visibility through the rest of the year." Similarly, Raymond James reported that Integer's "EP offering is strongly outgrowing the overall market with both volume acceleration and more content per procedure driving the above market growth," and underscored that it was "highly encouraged on the trajectory for the remainder of the year." And Truist reported on April 25, 2025 that Integer was "growing above-market in electrophysiology with the franchise benefiting from its exposure to Pulsed Field Ablation (PFA) catheters and ancillary products used in PFA procedures," and highlighted Integer as a "'back door' play into exciting MedTech product launch cycles, including PFA."

### D. Integer Announces Dziedzic's Sudden Retirement, And Dziedzic Cashes Out, Selling Virtually All Of His Integer Stock—$42 Million Worth—In Just One Day, While Concealing That Integer's PFA Business Had Cratered

50. Fueled by Defendants' wholly positive statements, Integer's stock price increased dramatically during the Class Period, reaching all-time highs in just a few months. Indeed, from the start of the Class Period on July 25, 2024 through January 28, 2025, the Company's stock price increased 25%, from $115.68 to a Class-Period high of $144.36.

51. Defendant Dziedzic took full advantage of the dramatic increase in Integer's stock price. On April 24, 2025—the same day that Integer reported a 17% increase in C&V sales purportedly driven by "new product ramps in electrophysiology," reaffirmed its full-year guidance,

and assured investors that its $800 million order book provided a "fixed guarantee" of above-market growth through at least the end of 2025—Integer issued a separate press release announcing the sudden retirement of Dziedzic. The press release stated that Dziedzic, who was then just 57 years old, was "retiring" as President and CEO and would be stepping down from the Board and replaced by the Company's COO, Defendant Khales, effective October 24, 2025. The press release gave no further reason for, or explanation of, Dziedzic's sudden departure—only effusive praise for his contributions to the Company over the prior eight years. Indeed, in the press release, the Board Chair stated that Dziedzic's "vision, strategy, and ability to create a high-performance culture ha[d] driven Integer's significant growth and value creation," including "above market organic sales growth with expanding margins," and credited him with having "reshaped Integer's business to focus on high growth markets."

52. Just one week later, on May 1, 2025, Dziedzic cashed out of virtually all of his Integer stock in a ***single day***. Specifically, that day, Dziedzic sold 338,975 shares of his Integer stock—a stunning ***88%*** of his total vested Integer shares that were held and acquired during the Class Period—at prices between $122.45 and $126.18 per share, generating proceeds of almost $42 million. Due to the low exercise cost of these shares (just approximately $3.1 million in total), this massive stock sale was almost pure profit, yielding Dziedzic a total of roughly $38.6 million in windfall profits.

53. Strikingly, Dziedzic transacted this sudden and massive one-day stock sale without any Rule 10b5-1 plan in place, underscoring the highly suspicious nature of the sale. Nothing required Dziedzic to sell his stock at this time, let alone in a single day, and no public explanation was given for the sale. Indeed, at the time of the sale, Dziedzic was scheduled to remain as the CEO and President of Integer for another six months. Moreover, adding to the suspicious nature

of the sales, Dziedzic's May 1, 2025 stock sales were not consistent with any prior trading. In fact, Dziedzic had not previously sold any of his stock during his eight-year tenure as CEO.

54. Significantly, as set forth further below, by the time Dziedzic sold his stock, he knew full well that Integer's critical EP business was in free fall. Indeed, as former senior Integer employees uniformly confirmed, the Company's critical PFA business was highly dependent on a single product—Medtronic's PulseSelect device. However, for the prior year, Integer had experienced such severe and pervasive issues at its Mexico manufacturing facility for the PulseSelect that the Company was completely unable to produce the device at the volumes that Medtronic needed. Moreover, the units that Integer *was* able to produce were claimed to be riddled with defects, prompting Medtronic to return (in late 2024 and early 2025) the vast majority of devices that the Company had produced. Due to these issues, by early 2025, Medtronic had entirely stopped ordering new PFA devices from Integer, and by no later than June 2025, Defendants made the decision to completely shut down the PulseSelect manufacturing line at the Company's Juarez, Mexico facility. Thus, in the weeks and months prior to Dziedzic's massive sale, he knew full well that demand for Integer's most critical PFA product had completely cratered, jeopardizing the Company's entire growth trajectory.

**E. The Truth Emerges**

55. In the months that followed Dziedzic's massive one-day stock sale, Defendants continued to tout Integer's PFA business as a growth engine for the Company. For example, on July 24, 2025, during Integer's Q2 2025 earnings call, COO Khales reiterated that Integer was "outperforming the market" in EP—and pointed to PFA as "driving a lot of growth" and "giving us some tailwinds" due to Integer's "strong pipeline" and "good momentum in that space."

56. Strikingly, Defendants continued to tout Integer's "above-market" performance in EP driven by "tailwinds" in PFA even mere weeks before the end of the Class Period. Indeed, at

the September 4, 2025 Wells Fargo Healthcare Conference—just six weeks before the Company would ultimately disclose that demand for its key PFA products had collapsed—Defendant Khales affirmed that Integer was continuing to experience above-market EP growth, underscoring that there was "a lot of momentum in that space" and that PFA continued to be a "tailwind" for Integer and asserting "net-net, we're positive on the PFA device itself, on the PFA devices themselves."

57. It was not until October 23, 2025—***the day before Dziedzic was stepping down as CEO of Integer***—that Defendants finally disclosed the truth to investors. On that day—after more than a year of repeatedly assuring investors that the Company was successfully executing on its growth strategy by penetrating the burgeoning PFA market—Integer stunned investors by revealing that the opposite was true: the Company's EP demand had collapsed. According to Defendants, the collapse in demand—which purportedly stemmed from a slowdown in two unspecified EP products—was so severe that it would force the Company to reduce its sales guidance for 2025 and would obliterate the Company's sales growth for 2026.

58. Specifically, during the Company's Q3 2025 earnings call on October 23, 2025 ("Q3 2025 Earnings Call"), COO Khales revealed that Integer "expect[s] sales of [three] new products to decline in 2026," with two of the three being "electrophysiology [EP] products." Khales made clear that the Company's poor outlook was directly attributable to these EP products, stating: "[t]he headwinds that we are seeing is related to two [EP] products. . ." Although Defendants refused to identify the specific products or customers involved, Khales stated that "[t]he market adoption of these products has been slower than forecasted." Consequently, Integer reduced its sales outlook for 2025 and projected a substantial "3% to 4% headwind to [Integer's] total company sales for [2026]."

59. During the call, Defendants revealed that, as a result of these headwinds, sales growth was expected to be flat in 2026, with an "organic sales *decline*" in the first half of 2026, a return to at-market growth anticipated only in the second half of 2026, and any above-market growth pushed out to 2027 at the earliest. Specifically, the slide presentation accompanying the call warned investors to "[e]xpect approx. flat 2026 sales, with a return to above-market growth in 2027," and disclosed that organic sales were expected to be "down low single-digit in 1H" of 2026, and only "recover to market growth during 2H" of 2026. With respect to its most critical growth segment, the slide presentation disclosed that "C&V sales [would be] flat to up low single-digit, due to a decline in select new products in Electrophysiology." On the Q3 2025 Earnings Call, Defendant Khales put it more plainly: Integer expected "a more flattish sales performance in 2026," and admitted that "our 2026 outlook is not where we would like it to be."

60. Significantly, Defendants acknowledged that, despite telling investors for over a year that the critical PFA market provided "tailwinds" to Integer's EP growth and that no "one product or end market" would "materially change the company outlook," Integer's demand collapse was almost entirely the result of reduced demand for just two EP products. Moreover, Khales admitted that, even if demand for these two products had not collapsed, Integer's EP business would only be growing ***at market rate***, not "above" or "1.5x" market as previously represented. Specifically, Khales stated that he expected Integer's EP business "to grow at the rate of market in 2026, ***excluding the negative impact of these two EP products***" – meaning that, accounting for the decline in those products, Integer's EP business was not even ***keeping pace*** with the market, let alone outgrowing it.

61. Notwithstanding Defendants' previous claims of "tremendous visibility" into their future sales, Defendant Khales now claimed that Integer had only learned of the decline recently,

*i.e.*, it had "learned during the course of the third quarter" that "market adoption of these products has been less than what we had anticipated," and that Integer had been in "discussion with our customers … during the course of the third quarter," with those discussions "continu[ing] into the fourth quarter."

62. The market reacted immediately to the Company's disclosures, slashing the value of Integer shares by nearly one-third in a single day. Specifically, on October 23, 2025, the Company's stock price plummeted $35.22 per share, from a closing price of $109.11 per share on October 22, 2025, to a closing price of $73.89 per share on October 23, 2025, a decline of over 32% on extraordinary trading volume.

63. Analysts were incredulous at the sudden and unexpected decline in Integer's most critical growth products and called management's credibility into doubt, particularly given their assurances of EP growth as recently as six weeks earlier, as well as Defendants' repeated claims of having "tremendous visibility" into its sales. And, despite Defendants' refusal to identify the specific products and customers at issue, analysts identified the impacted products as PFA products, and speculated that the key customer at issue was Medtronic.

64. *First*, analysts emphasized that Defendants' October 23, 2025 disclosures shattered the growth narrative that management had repeatedly promoted throughout the Class Period. For example, Bank of America analysts expressly noted that the overall EP market was growing rapidly, and thus inferred that Integer's failures were Company-specific, rather than tied to overall market demand, noting that Integer's growth had slowed even as the EP "market exploded," and that Integer "does not appear to be tied to the winning product." Citi identified the same disconnect, noting that the Company had previously promised it was insulated from risk by its diversification of products, *i.e.*, "[t]he reason that ITGR has been a stock to recommend has been

the diversification of its business model, and the potential to participate in emerging markets such as PFA"—the precise investment thesis that the October 23, 2025 disclosure had eviscerated. An October 23, 2025 Truist report similarly observed that the "[b]ig guidance reduction in 4Q25 and 2026 calls into question some key [long-term] acceleration drivers."

65. *Second*, analysts openly doubted the credibility of Defendants' claim that they had only learned of the decline in 3Q 2025, and questioned how it was possible that Integer could suddenly—and simultaneously—just discover a sharp drop in demand for three different products, particularly given Defendants' past claims of their "tremendous visibility" into future sales. For example, during the question-and-answer portion of the earnings call, a Bank of America analyst repeatedly questioned whether Defendants had really only learned of the demand decline recently, asking: "it sounds like it's a customer who as of Q3 you didn't really know about it until Q3. I just want to make sure that's clear," and then, after Khales responded in the affirmative, the analyst repeated, "[a]nd you didn't know about it until Q3 it sounds like?" Similarly, an Oppenheimer analyst noted that "by definition there are demand schedules established" through which Integer "come[s] up with [its] backlog," and questioned Khales: "You say your backlog is largely unchanged, but two EP customers are seeing softness. So I'm struggling to reconcile the contractual arrangements versus the suddenness of the demand curve moving leftward." Tellingly, Khales did not answer the question.

66. Citi noted in the headline of its October 23, 2025 report (in which it slashed its price target in half, from $140 to $77) Integer's "Disappointing Guide (to Say the Least)," and bluntly questioned: "What just happened?" Citi described Integer's 2026 outlook as "underwhelming … with many unanswered questions." Further casting doubt on Defendants' credibility, Citi opined in another report issued that same day that it was "odd" that demand for three critical products

would suddenly crater at the exact same time, adding that even "management called [this] an aberration, highly unusual"—and concluded that "[c]learly there is some explaining that needs to be done." Likewise, Truist issued a report that same day slashing its price target on Integer stock and noting that Integer appeared "more susceptible to aberrations" in its sales growth than investors had previously been led to believe, and asking pointedly: "Why is that?" Argus Research reported it was "surprised" by the sudden disclosure of three recently launched products facing poor commercial adoption, given that Integer had "historically cited strong customer demand and high visibility into its manufacturing forecasts." KeyBanc identified "legitimate questions around the underlying thesis" and the "overall level of forward visibility," and noted that investors would need to "gradually rebuild" confidence.

67. Analysts also directly called out management for failing to disclose the demand decline even in its most recent investor calls and conferences. For example, Wells Fargo issued a report on October 23, 2025, downgrading its rating on Integer shares and noting that Defendants "did not flag any EP issues at our Healthcare Conference on Sept[ember] 8"[1]—*i.e.*, just six weeks prior when Khales instead reassured investors of Integer's continued PFA "tailwind."

68. *Third*, throughout the Q3 2025 Earnings Call, analysts repeatedly pressed Defendants for basic details about the nature of the products and customers driving the disclosed headwinds. In response, however, Defendants stonewalled every question. For instance, when asked whether the affected EP products were PFA or RF products, Khales confirmed only that they were "two EP products." When asked whether the issues involved any of Integer's three largest EP customers, Khales stated that Integer's EP business was "very broad" and refused to be more

---

[1] Integer's appearance at the 2025 Wells Fargo Healthcare Conference took place on September 4, 2025. The October 23, 2025 Wells Fargo report's reference to September 8 is presumably a typographical error.

specific. And when asked whether the two products came from two separate customers, Khales confirmed only that "there are two products." As one frustrated analyst summarized: "all of us are trying to get bits and pieces here."

69. Despite Defendants' refusal to identify the two EP products and customer(s) that decimated Integer's growth prospects for at least the following year, analysts identified the affected EP products as PFA devices and speculated that Medtronic might be the key customer driving the collapse. As Oppenheimer observed in a report issued October 23, 2025, "it's reasonable to infer the EP products experiencing headwinds are PFA-related, potentially suggesting slower than expected customer demand for [Johnson & Johnson/Medtronic] offerings." Raymond James similarly tied the lowered guidance for 2025 and 2026 to Integer's PFA products, stating in an October 23, 2025 report that "[t]he EP portion, in [their] view, could be tied to later entrants in pulsed field ablation (PFA) and/or their legacy products that are being supplanted by the new technology." Piper Sandler issued a report the same day speculating that Medtronic's PulseSelect was one of the affected EP products, and further observed that the deceleration in Integer's C&V sales during the quarter appeared "largely due to 'Customer B,'" which Piper Sandler surmised was Medtronic.

### F. Plaintiff's Investigation Confirms That Defendants Knew Integer's Manufacturing Failures And Medtronic's Falling Demand Had Devastated The Commercial Launch Of Its Most Important PFA Product, Reversing The Company's Growth Prospects

70. As set forth below, Plaintiff's investigation has confirmed that the sharp growth reversal in Integer's critical EP business, which Defendants belatedly revealed at the end of the Class Period, was due primarily to the loss of business from Medtronic for its newly-approved PFA device known as PulseSelect. Significantly, Plaintiff's investigation has confirmed that this loss of business was not an unexpected development that suddenly surfaced in 3Q 2025—as

Defendants claimed at the end of the Class Period. Instead, as confirmed by the cross-corroborating accounts of two former high-level Integer employees with direct involvement in PulseSelect's manufacture, Integer had long experienced significant issues with its manufacturing of the PulseSelect device.

71. Indeed, by the start of the Class Period in July 2024, Integer was already severely delayed in getting its manufacturing line for PulseSelect up and running; by the end of 2024, Integer could not fulfill anywhere near Medtronic's orders for PulseSelect; by early 2025, Medtronic had declined to place any new orders for PulseSelect and was returning thousands of devices it had already purchased from Integer; and by mid-2025, Integer had shut down its sole PulseSelect manufacturing line and instituted mass layoffs of all employees involved in manufacturing the product. Remarkably, Defendants never disclosed any of this highly material information to investors. Instead, Defendants falsely touted Integer's PFA business as a "tailwind" and a "net positive" for Integer even as late as September 2025—two months after the Medtronic PFA manufacturing line had been fully shut down.

### 1. Former Employees Confirm That, As Of The Start of The Class Period, Integer Was Already Experiencing Severe Manufacturing Delays and Deficiencies For Its Most Important PFA Product

72. For over a decade, FE[2] 1,[3] served as Customer Operations Manager at Integer's sole manufacturing facility for Medtronic's PulseSelect, which was located in Juarez, Mexico. In

[2] Individuals referred to herein as "FE #" are former employees of Integer or Medtronic. All FEs provided the information described herein to counsel for use in this complaint. In order to help preserve the anonymity of the FEs, female gender pronouns are used in connection with all FEs regardless of their gender.

[3] FE 1 was Integer's Customer Operations Manager for the Juarez site from January 2014 until July 2025. In that role, she reported to the Senior Operations Director Francisco Aguilar, who in turn reported to VP of Operations Bill Schrensky, who in turn reported to SVP of Operations Gary

that role, from 2012 through July 2025, FE 1 was responsible for all strategies related to customer service and operations; managing revenue reporting and forecasting; and coordinating with Integer's OEM customers, including Medtronic. FE 1's responsibilities included Medtronic's PulseSelect PFA device, for which Integer was the only contract manufacturer, and which was Integer's only fully assembled PFA system.

73. FE 1 confirmed that Integer's Juarez facility was the exclusive Integer facility that assembled Medtronic's first PFA device, which Lead Plaintiff's investigation confirmed was Medtronic's first-generation PulseSelect device.[4] FE 1 explained that she was aware of Integer's Q3 2025 earnings release on October 23, 2025, wherein the Company disclosed that it expected sales of three new products to decline in 2026, including for two electrophysiology products, and that the Company had stated that "market adoption" of these products had been slower than it had forecasted, and that there was decelerating growth "reflecting a decline in the two new [EP] products." FE 1 said she was "100%" familiar with these issues due to her position at Integer.

74. FE 1 explained that Medtronic's PFA device was supposed to be the biggest growth product for the Company in 2025. She emphasized that the Medtronic PFA growth opportunity would have been "so tremendous" for Integer had the device made it to market in time to be competitive with other major PFA devices. FE 1 advised that Integer had worked on

Lopez. FE 1 was laid off as part of a mass layoff at the Juarez facility in July 2025 after Medtronic stopped Integer's production of their PFA device.

[4] The PulseSelect device was Medtronic's first generation PFA device, and its only approved PFA device as of the start of the Class Period. As discussed below, in anticipation of its commercial launch, Medtronic was actively seeking to ramp up production of PulseSelect during the first half of 2024, placing larger orders with Integer throughout the course of 2024. Medtronic's second-generation PFA system, known as Affera, did not receive FDA approval until October 2024. According to FE 1, Affera was not manufactured at the Juarez facility. As discussed below, Plaintiff's investigation confirmed that Integer had no involvement in the manufacture of Affera, which Medtronic largely outsourced to a large contract manufacturer based in China.

Medtronic's first PFA device for years, but experienced various issues that resulted in Medtronic being late-to-market with the device. FE 1 explained that the R&D in preparation for the manufacturing of Medtronic's PFA device was done at Integer's Plymouth site in 2022 and 2023. Medtronic announced FDA approval of its PulseSelect PFA device on December 13, 2023, by which time FE 1 said Integer's Juarez facility had already begun setting up its manufacturing of the device; however, Integer faced difficulties in getting its manufacturing line ready for the product's launch. FE 1 stated that, at the outset of 2024, Medtronic ordered roughly 8,000 PFA units, and then later pushed for Integer to make a total of 14,000 by the end of 2024.

75. However, FE 1 explained that Integer struggled to make its manufacturing process stable. As a result, by July 2024, Integer still had not gotten its Medtronic PFA manufacturing line started. In other words, by the start of the Class Period, Integer was unable to manufacture a single Medtronic PFA device.

76. FE 1 explained that the Juarez site did not manufacture any Medtronic PFAs until September 2024. However, even after Juarez's manufacturing line for Medtronic's PFA device finally became operational in September 2024, Integer struggled greatly to fulfill Medtronic's 8,000-unit order for 2024. FE 1 explained that, initially in September 2024, the site was only able to produce "one lot" – or 60 Medtronic PFAs – per week, and that "by that time we were already three months late." As such, she explained that Integer was still nowhere near on pace to complete 8,000 units by the end of 2024—*i.e.*, the low end of Medtronic's initial order, and far short of Medtronic's revised request for 14,000 units for 2024. She indicated that by the end of 2024, Integer had only made 5,000 units, and that even these had mostly been completed during the fourth quarter (October – December) of 2024.

77. Notably, FE 1's account of Integer's internal struggles manufacturing PulseSelect was consistent with public statements by Medtronic's CEO, Geoffrey Martha, who stated on Medtronic's November 19, 2024 earnings call, that "our ablation business didn't accelerate as we expected this quarter because of [a] third-party component supplier that experienced an interruption." Medtronic did not name the supplier, but as noted above, Integer was the sole supplier for Medtronic's PulseSelect, and Integer's Juarez facility was the sole site for manufacture of the fully assembled product.

78. FE 1 explained that Integer's initial expectation was that Integer would produce 25,000 Medtronic PFA units for 2025, but before year end 2024, Medtronic told Integer in a call that they were going to reduce demand. FE 1 recalled being told this by Denise Blasey, Integer's Vice President of Global Accounts.

79. FE 1 further explained that Integer's budgeting process began in June and was finalized in September for the upcoming year. In September 2024, Integer management wanted her to include 22,000 Medtronic PFA units in her budget for 2025. At that time, she recalled thinking "I can barely make 60 a week – how are we going to do 22,000?" FE 1 further confirmed that at the time, Integer did not have a purchase order ("PO") from Medtronic for the 22,000 units forecasted for 2025. She only had the POs for 8,000 units from 2024.

80. Compounding the problems already putting Integer's Medtronic PFA revenue at risk, during Q4 2024, Medtronic began returning the limited amounts of PFA products that Integer was able to manufacture because of purported quality issues. Specifically, FE 1 recalled that around Thanksgiving 2024, Medtronic returned around 1,100 of the Integer-manufactured Medtronic PFA devices due to claimed defects, and by 1Q 2025, Medtronic wanted to return all 5,000 units that were manufactured in 2024 for the same reason. FE 1 explained that, once

Medtronic started returning products, Integer was having daily calls with Medtronic's Director of Quality to understand lot by lot what defects were being found. FE 1 explained that she inferred that Medtronic was seeking to get out of its volume commitment with Integer, in part because Medtronic had been late to the market with PulseSelect due to the manufacturing delay, and because Medtronic was now switching focus to their second generation PFA product (Affera). As she explained, "their [Medtronic's] horse is already gone with version one and now they are going to focus all of their energy and money into going to next generation."

81. FE 1's understanding was consistent with the evolution of Medtronic's PFA systems and testimonials by experts in the field. In October 2024, Medtronic's second generation PFA device, Affera, was approved by the FDA, and, as 2025 progressed, Medtronic's earnings calls placed increasing emphasis on Affera as a more significant growth product than PulseSelect, with Affera described as the "premium" product with "the highest demand," and PulseSelect presented as a secondary, lower cost alternative.[5]

82. FE 1 further explained that by Q4 2024, Integer had not received a single purchase order from Medtronic for 2025 for its PFA device. According to FE 1, by January and February 2025, "it was a regular topic of conversation" that there were still no Medtronic purchase orders

---

[5] Industry experts further confirm FE 1's understanding. For example, a cardiac electrophysiologist specializing in abnormal heart rhythm disorders confirmed a significant clinical migration from Medtronic's PulseSelect to Affera in a November 7, 2025 interview with AlphaSense, a leading investment research and market intelligence firm. According to the electrophysiologist, over the preceding year, PulseSelect volume had declined from at least 50-60% to about 20% of his cases, with Affera use climbing to about 50-60% of his cases, due to Affera's technical superiority. Similarly, in a December 23, 2025 interview with AlphaSense, a medical professional with extensive experience in PFA procedures at a Chicago hospital that performed "over 1,000 cases annually" stated that, among all different PFA devices provided by the different medical device companies, Medtronic's Affera had approximately "90% use," far surpassing all other available PFA devices. While Medtronic still lists PulseSelect among its PFA products, it has increasingly promoted Affera as its main PFA system, and does not break out sales of its different PFA products.

for its PFA device for 2025, leaving Integer with only the remaining 2024 POs that had not yet been fulfilled. FE 1 said that she was fighting with the other sites in December 2024 because they made components for Juarez and wanted Juarez to take them, but Juarez didn't want them "because we [didn't] have a purchase order from the customer." FE 1 further explained that normally she would issue purchase orders to the Company's Salem, Virginia facility for parts, but that, by early 2025, because she had received no new POs from Medtronic, Juarez stopped issuing POs to Salem. She also said that by March 2025, the Company temporarily shut down production of the Medtronic PFA for one week, and that, by this time, the writing was on the wall: the 2025 revenue that Integer wanted from the device was gone.

83. FE 1 explained that Medtronic told Integer in April 2025 that it was going to significantly slow down production of the PulseSelect system. She said that the Juarez facility alone lost $14 million on anticipated sales because of this initial slowdown in early 2025, but that the overall revenue impact for Integer was tens of millions of dollars larger because Integer's sister sites were supplying Juarez with components for the Medtronic PFA, and the revenue for these components was reported separately. She said that there were three or four sites that were supplying components to make that final product. For example, the expected revenue from the Company's site in Salem, Virginia was $60 million for their precious metals to make certain components. FE 1 further recalled that, by April or May 2025, Medtronic returned the remainder of the initial 5,000 units produced due to purported defects.

84. Another former high-level Integer employee with direct responsibility for the manufacture of PFA products, FE 2, confirmed that, by no later than June 2025, Integer management communicated its decision to shut down Medtronic PFA production at Integer's Juarez facility, and that, in July 2025, Integer in fact laid off all Juarez employees responsible for

Medtronic PFA production and shut down the entire manufacturing line. FE 2 was employed as a Senior Sourcing Manager at Integer from Q2 2024 through Q3 2025, and reported to Integer Vice President of Strategic Sourcing Laslow Giles. FE 2 confirmed that Integer was the only manufacturer of the Medtronic PFA product, the Company's Juarez facility was the only site where the product was fully assembled, and the Juarez site employed more than 100 workers dedicated to manufacturing the Medtronic PFA.

85. FE 2[6] learned of the lack of orders for the Medtronic PFA while in Juarez in June 2025, explaining that she was instructed that Medtronic had "already communicated to Integer" a significant slowdown in PFA orders. Also in June 2025, FE 2 learned that the Company had decided to shut down the entire manufacturing line for Medtronic's PFA device at the Juarez site and fire all its line operators. Shortly after, in July 2025, FE 2 explained that Integer in fact laid off all of its employees responsible for Medtronic PFA production, and thus shut down the manufacturing line and ceased producing the devices for Medtronic. FE 1's experience corroborated this event—in fact, she was among the employees laid off in July 2025 as part of the mass layoff when the Medtronic PFA line shut down.

### 2. Former Employees Confirmed That Integer's Most Senior Officers Knew And Were Regularly Updated On The Severe Manufacturing Delays and Deficiencies Plaguing Its Critical Medtronic PFA Product

86. Significantly, both FE 1 and FE 2 confirmed that Integer's most senior officers, including the Individual Defendants, knew of all of these issues as they occurred.

87. FE 1 described her direct involvement in gathering key data points for monthly "Operational Site Reviews" for the Juarez facility that included executive management. FE 1 advised that the Operational Site Reviews were held on virtual calls on the second Tuesday of

[6] FE 2 worked for Integer as a Senior Sourcing Manager from July 2024 through September 2025. She reported to Vice President of Strategic Sourcing Laslow Giles.

every month, and that Defendant Khales and numerous other senior finance, engineering, and quality executives participated in the calls.[7]

88. FE 1 explained that each site operated as a separate unit and reported their P&L separately. FE 1 explained that she gathered data on the Juarez site's operations and revenue forecasts for these monthly site meetings, which was then presented during the virtual calls. FE 1's portion of the monthly Operational Site Reviews was the revenue and feedback on any major swings to it. FE 1 noted that ordinarily, Operational Site Reviews were normally 30 minutes per site, but that by the second half of 2024, they had swelled to at least an hour for Juarez because of all of the "drama" around the Medtronic PFA lines. In fact, there were so many issues around the Medtronic PFA that there "came a point" in the "beginning of 2025" that there were so many concerns about meeting Medtronic PFA revenue targets that Juarez along with the two sites that produced components for the Medtronic PFA (in Salem, Virginia and Trenton, Georgia) had "their own day" for Operational Site Reviews.

89. FE 1 also described her central role, in advance of each monthly Operational Site Review, in a color-coding process designed to identify for executive management the risk-levels of revenue streams at the Juarez site, including those associated with Medtronic's PFA device. FE 1 stated that in connection with the monthly reviews, she was responsible for color-coding revenue as either green (low risk), yellow (medium risk), or red (high risk). This was prepared for the current quarter and the upcoming quarter. FE 1 prepared the rolling forecast in Excel. The Excel

[7] FE 1 explained that the Integer Cardio & Vascular segment executive team met with each of the segment's eight sites once a month during the Operational Site Reviews. For Juarez's monthly Operational Site Review, in addition to COO and C&V President Payman Khales, FE 1 recalled that Juarez's Senior Operations Director Francisco Aguilar, Juarez's Director of Engineering Edgar Perez, Juarez's Director of Quality Pedro Maldo Aldrete, Juarez's HR manager, Juarez's Finance Manager, and FE 1 participated in the Operational Site Reviews.

document was then provided to Aguilar, and his team put the forecast into a PowerPoint for the monthly operational reviews.

90. When asked when she started placing the Medtronic PFA revenue in red for COO Khales and the other executives to see, FE 1 stated that this began by Q4 of 2024 because she was not meeting her numbers for 2024 and there was "no way in holy hell" that she was going to meet the 2025 number without a "lot of changes." As a result, beginning in Q4 2024, executive leadership, including COO Khales, began asking questions about the 2025 Medtronic PFA forecast revenue during the monthly Operational Site Reviews. FE 1 explained that typically 95% of her revenue forecast for the following quarter would have been supported by a purchase order. Because Integer did not have a purchase order from Medtronic for 2025, roughly 50% of her total forecasted Juarez revenue for 2025 was in red—meaning at risk and not supported by a purchase order. FE 1 confirmed that she explained to Khales and the other executives that Medtronic was returning devices and was not issuing any more purchase orders. She added, "I included that we did not have POs supporting this demand." As FE 1 stated, that was when the "red lights were flashing," which executive leadership saw first-hand. FE 1 further confirmed her 2025 revenue forecasts continued to show the Medtronic PFA revenue for 2025 in red throughout the end of her tenure with Integer in July 2025.

91. FE 1 also stated that the nearly 1,100 units that were returned around Thanksgiving 2024, were reflected in her weekly reports to her manager, Senior Operations Director Francisco Aguilar, and documented the potential revenue impact of the returns. FE 1 specified that these reports contained actual data—either products that were shipped or products that were returned. Anything pending would have been noted on a PowerPoint presentation. According to FE 1, these reports were forwarded by Aguilar upstream, making their way to executive management. FE 1

stated that the authorization to accept the returned products came from discussions between Khales and the Director of Quality for the Juarez site, Mauro Aldrete. She added that Integer also had a Senior Director of Quality, Pedro Trujillo, who was responsible for several sites. She noted that Khales was definitely aware of those returns and their subsequent financial impact through meetings with the commercial and quality teams.

92. FE 1 indicated that Medtronic's non-issuance of POs in Q1 2025 was another issue that was quickly brought to the attention of executive management and communicated to Integer's commercial team. FE 1 explained that she communicated Medtronic's non-issuance of POs for 2025 to her manager, Aguilar, who in turn communicated that upward. She noted that Aguilar had meetings with his manager, VP of Operations William ("Bill") Schrensky, SVP of Operations Gary Lopez, and Defendant Khales. In addition to these meetings, Aguilar had regular calls with Schrensky and Lopez and weekly calls with Khales.

93. FE 1 confirmed that Defendant Khales was "100%" involved in the discussions with Medtronic about not issuing POs for their committed 2025 orders. She confirmed that Khales definitely would have stepped in over Medtronic's returned units, and pressure would have been placed on quality executive leadership to engage with Medtronic on the criteria for acceptable and non-acceptable returns. When asked about the reduced demand negotiations with Medtronic in early 2025, FE 1 stated that Khales communicated with his counterpart at Medtronic once he was apprised of how the negotiations were going.

94. Additionally, FE 1 described a variety of databases and systems that executive leadership had access to monitor sales. For example, FE 1 stated that executive leadership had access to different modules in their Oracle ERP which tracked actual sales. FE 1 specified that, in particular, Oracle ERP's module known as Power BI collected all their data for business analytics,

which was updated overnight and was available to executive leadership via the Company's intranet. She said that executive leadership could therefore see in this database that only 50% of the Medtronic PFA revenue was covered by POs, which was highly unusual since forecasts were based on POs, and they typically had no more than 5% of unsecured POs within a three-month period. She added, "By Q4 2024 it was showing that 50% of our revenue [referring to the Juarez site] was not secured by POs from Medtronic."

95. FE 2 corroborated these facts. For example, FE 2 similarly explained that Medtronic's sharply reduced orders and Integer's related decision to shut down its exclusive Medtronic PFA manufacturing line at the Juarez site, were known by Integer's executive leadership. FE 2 stated that Integer's executive leadership team, including COO Khales and John Harris, EVP Global Operations and Manufacturing Strategy, definitely would have been aware that Medtronic was going to be slowing down production of its PFA product. FE 2 confirmed that any communications from Medtronic on orders and demand for its PFA system would be communicated up to executive management, "especially something of that magnitude"—referring to the sharp reduction in orders that led to the stoppage and then complete shutdown of the Juarez manufacturing line. According to FE 2, that communication would be in emails, conference calls, and PowerPoint presentations saved on SharePoint.

96. FE 2 also corroborated and expanded on FE 1's account of how Integer's monthly operational site reviews with executive management were conducted. FE 2 explained that Integer had a process that included monthly PowerPoint presentations to the executive teams on what was happening at each manufacturing site. These reports included all the numbers for the month on what they did and what they had planned. FE 2 added that the monthly report also included any issues that a site experienced which may affect its P&L forecasting. FE 2 also corroborated that,

in preparation for these meetings, forecasted revenue was marked green (low risk), yellow (medium risk) or red (high risk).

97. In addition to these monthly meetings, FE 2 also knew that Defendants Dziedzic and Khales and the rest of the executive management team were involved in weekly meetings concerning the Company's manufacturing sites—including Juarez—wherein revenue issues for each site were discussed. FE 2 was aware of these meetings because she had the responsibility of preparing documents for them concerning any supply issues facing the Company's manufacturing sites, and she understood that the meetings also covered revenue issues. She commented, "They [executive management] were constantly talking about what was happening at the plants on a weekly basis."

98. FE 2 further confirmed that senior executive leadership would have known about, and been involved in, the decision to shut down Integer's entire manufacturing line for Medtronic's PFA device. FE 2 stated that the executive leadership team would have made the decision to lay off over 100 people in the Juarez plant, which took place in July 2025, and confirmed the layoffs were "directly related to Medtronic's slow-down."

### 3. Former Medtronic Employees Confirmed That Integer Played No Role In Medtronic's Second Generation PFA Device, Affera, Which Was Rapidly Overtaking PulseSelect As Medtronic's Main PFA Product

99. The accounts of the former Integer employees noted above were corroborated by multiple former Medtronic employees, each of whom confirmed that Medtronic decided to utilize a different contract manufacturer, based in China, to manufacture Medtronic's second-generation PFA system, known as Affera, in connection with its U.S. launch in October 2024.

100. FE 3, a former Medtronic Senior Supply Chain Manager for Affera from August 2023 until July 2024,[8] described how Medtronic initially wanted to manufacture Affera in-house due to its technological sophistication, but ultimately decided to engage a contract manufacturer based in China (*i.e.*, not Integer) to help the company meet its production goals.

101. FE 3 stated that when she started working at Medtronic in August 2023, Affera was already approved and being sold in Europe. The plan in the U.S. was to ramp up production of Affera in advance of its regulatory approval, so Medtronic would be able to meet demand once it was ready for its U.S. commercial launch. Medtronic's original plan was to manufacture the Affera device in-house using Affera's existing plant in Burlington, Massachusetts, which focused exclusively on Affera. FE 3 advised that Medtronic's goal was to manufacture 3,000 to 4,000 units per month in preparation for Affera's U.S. launch. However, FE 3 recalled that, while Medtronic initially thought it could manufacture the device in-house, the device was so technologically complicated that Medtronic could only manufacture 50 Affera units per week, far below its targeted goal. Consequently, FE 3 advised that Medtronic decided to outsource the subassembly of most of Affera to a large and well-known contract medical device manufacturer in China.

102. FE 3 noted that in addition to using a Chinese contract manufacturer to assist Medtronic in manufacturing Affera for sale in the United States, Medtronic also directed subassemblies to Medtronic's site in Ireland, for supply in Europe. FE 3 stated that Medtronic's site in Ireland used the same Chinese contract manufacturer. When asked if she ever heard Integer

[8] FE 3 was employed as a Senior Supply Chain Manager for Medtronic's newly acquired Affera division from August 2023 until July 2024. She was responsible for leading the warehouses where Affera was assembled, as well as managers and planners for the newly acquired Affera division. She first worked at the Company's manufacturing site for Affera in Burlington, Massachusetts, and then at its Billerica, Massachusetts, which had more state-of-the-art operations.

having anything to do with manufacturing the Affera device, either when she was at Medtronic or after she left, FE 3 answered "no, never." FE 3 added that she never even heard of Integer.

103. In addition to FE 3, four other former Medtronic employees directly involved in Affera's manufacture, engineering, and/or commercialization, similarly expressly confirmed that they had never heard of Integer having anything to do with Medtronic's second-generation, Affera PFA device.

104. FE 4 was employed by Medtronic as a Senior Software Engineering Director from October 2022 until November 2025, and was responsible for scaling and managing teams of 70 engineers and leading Affera through acquisition to commercialization at scale. Before it was acquired by Medtronic, FE 4 was employed by Affera, Inc. as Chief Software Architect from July 2014 to October 2022. When asked about Integer, FE 4 indicated that she was not familiar with it and was not aware of Integer doing any contract manufacturing or assembly for Medtronic's Affera mapping and ablation system.

105. FE 5 was employed by Medtronic as a Senior Manufacturing Engineer from January 2024 to May 2025, and was responsible for providing engineering support and solutions for the manufacture of Affera devices. When asked if Integer Holdings played a role in the manufacture or subassembly of Medtronic's Affera devices, FE 5 also indicated that she was not aware of Integer Holdings doing any contract manufacturing work for Medtronic's Affera mapping and ablation system.

106. FE 6 was employed by Medtronic as a Supply Chain Manager at its Billerica, Massachusetts facility from August 2022 until May 2025. She was responsible for leading supply chain operations for the launch of the Affera mapping and ablation system and implementing scalable planning systems to support the ramp-up for the Affera Sphere-9 catheter. Before its

acquisition, FE 6 previously worked at Affera, Inc. from March 2022 until August 2022 as a Senior Supply Chain Manager. FE 6 likewise indicated that she was not familiar with Integer and she was not aware of it being a contract manufacturer for Medtronic's Affera mapping and ablation system.

107. Finally, FE 7 was employed by Medtronic as a Reliability Engineer II from October 2024 to December 2025 and was responsible for developing in-process test method validation studies for the Affera ablation catheter disposables and Affera systems. Like FEs #3-6, FE 7 stated that she was not aware of Integer doing any contract manufacturing work on Medtronic's Affera PFA system.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

108. Throughout the Class Period, Defendants issued numerous materially false or misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. These misstatements created in the market an unrealistically positive assessment of Integer's business prospects, thus artificially inflating the Company's stock price.

### A. Q2 2024 Earnings Release And Conference Call

109. On July 25, 2024, Integer issued a press release before market open announcing its financial results for the second quarter of 2024. During the Company's Q2 2024 Earnings Call that day, Dziedzic specifically touted the Company's EP business and PFA products as key growth drivers. For example, in response to a KeyBanc analyst question about the growth trajectory of the larger Cardio & Vascular segment, CEO Dziedzic highlighted the outperformance of the EP business, stating "<u>if you look at our past 4 quarters, our electrophysiology business</u>, although we don't report the specific number, <u>it's growing at 1.5x the market growth rate</u>."

110. During the call, a Piper Sandler & Co. analyst focused on the Company's "direct exposure to the growth" of the PFA category "over the next several years," and asked if it would be "dramatic." In response, CEO Dziedzic affirmed that PFA would be a significant "tailwind" to Integer's overall performance, while also assuring the analyst that the Company's growth was not at risk because it was not overly dependent on "one part of our business" or "one program":

> I don't know that I would characterize dramatic because I'm reflecting on total Integer and our commentary that no one part of our business or one program is going to materially meaningfully drive the company. I will say, yes, PFA, we have strong visibility to the pipeline, multi-generation product development plans, and we know which ones we're on and which ones we're working to get on, so we do have very strong visibility, and we absolutely expect PFA as a therapy to be at tailwind.

111. During the same Q2 2024 Earnings Call, an Oppenheimer analyst asked about the "incremental contribution from PFA" toward organic growth in the C&V segment. In response, CEO Dziedzic underscored the Company's above-market growth in the critical EP segment, stating in relevant part: "[W]e're very excited about our C&V business. Electrophysiology and structural heart, in particular, they're growing faster than the market. We measure our customer sales, we aggregate that. We look at what the market is growing at, and we're growing faster than the market in those 2 important segments."

112. The statements in ¶¶109-11 were materially false or misleading when made. Specifically, it was materially false and misleading to claim "that no one part of our business or one program is going to materially meaningfully drive the company." In reality, as revealed at the end of the Class Period, Integer's growth was heavily driven by, and highly dependent on, a single product—Medtronic's PulseSelect PFA device. In fact, Integer relied on the Medtronic PulseSelect to such an extent that the Company's loss of Medtronic's business (plus reduced demand in one other EP product) directly led to Integer reducing its sales growth forecast for 2025 and to forecast zero sales growth for all of 2026.

113. Additionally, it was materially false and misleading for Defendants to tout 1.5x market growth in EP and a purported "tailwind" from PFA products when, as alleged further above at §IV(F), by the time of these statements, Integer was already severely delayed in starting its manufacturing for its most critical PFA product—Medtronic's PulseSelect—as confirmed by FE 1. Indeed, these delays were so severe that Integer did not even *begin* manufacturing the Medtronic PFA device for another two months (*i.e.*, in September 2024), and could not reach a pace even close to what was needed to satisfy Medtronic's demand.

114. During the Q2 2024 Earnings Call, a Truist analyst asked Defendants, "has anything changed at your OEM customers with respect to their end market demand curves or what their kind of intermediate to longer-term ordering patterns look like, any downward revisions or upwards from their outlook that kind of flows down to you?" In response, CEO Dziedzic stated the Company had not seen any "material meaningful change in customer expectation[s]" and again pointed to the Company's "order book" as providing Defendants with "tremendous visibility" into "the continued strength in the market," "high expectations of our customers for growth," and consistent "order patterns" of customers for new programs that they were bringing to market:

> We have not seen any material meaningful change in customer expectation when you look out, I'll frame it into '25 and beyond, given your question about longer term. I mean sitting here with almost $900 million of order book, we were expecting that order book to start to come down because there are some components or some elements of that higher order book that are connected to the exit of our Portable Medical business, due to the strong demand in guidewires that we ask customers to place orders much further in advance given the capacity coming on. We still expect the order book to come down. I would have expected the order book to come down a little sooner than it has. And I think that points to the continued strength in the market, continued high expectations of our customers for growth. They continue to place orders out further into the future, and it gives us tremendous visibility. So I think our customers remain very, very optimistic about their most exciting programs that they're bringing to the marketplace. And the overall market growth rates continue to show optimism. And I look to our order book and I look at the order patterns, very much in line with what we expected entering the year and they've continued.

115. For the reasons alleged further at §IV(F), it was materially false and misleading to claim, in direct response to analyst questions about OEM order patterns, that Integer had "not seen any material meaningful change in customer expectation," when Integer was in fact struggling to ramp up its manufacturing of the PulseSelect device for Medtronic, one of its top three customers. In fact, these manufacturing delays—which were ongoing at the time of these statements—were so severe that Medtronic's entire release of the PulseSelect was delayed by months, forcing it to publicly report on the delay, which it attributed to an unnamed "third-party component supplier."

**B. 2024 Wells Fargo HealthCare Conference**

116. On September 4, 2024, Integer management presented at the 2024 Wells Fargo Healthcare Conference. During the conference, an analyst asked about the dynamics of PFA within Integer's EP portfolio, noting that "a large part of the growth we're seeing right now in the EP market is really the ASP uplift from PFA" and probing how Integer captured value from "increased content and more procedures." In response, Dziedzic represented that Integer's EP portfolio had been "growing at 1.5 times the market rate" over the past four quarters. Moreover, after specifically referencing the two PFA devices that had been approved in the U.S. at the end of 2023 and beginning of 2024—one of which was PulseSelect, which had been approved by the FDA on December 13, 2023—Dziedzic reiterated that the Company was "outperforming in that space" which it expected "to continue for the foreseeable future":

> Yeah. So, maybe I'll answer it this way. And I think I shared this on our last earnings call, our electrophysiology portfolio products. So, this is access diagnostics and ablation, is growing at 1.5 times the market rate over the last four quarters. Now, when I say that, that includes half a year last year and the first half of this year. And we know the two devices that are approved in the US were approved at year end and beginning of this year, last year. But we're growing faster than the market our portfolio of EP products. And so, we feel like we're outperforming in that space and we expect that to continue for the foreseeable future.

117. The statements in ¶116 were materially false or misleading when made. Specifically, it was materially false and misleading to claim (in direct response to questions about growth from PFA products), that Integer was "growing faster than the market" in EP and "outperforming in that space" with expectation for "that to continue for the foreseeable future." In reality, as alleged further above at §IV(F), by the time of these statements, Integer had already experienced months-long delays in ramping up manufacturing for its most critical EP product—Medtronic's PulseSelect PFA device—such that, by September 2024, manufacturing was only just starting up for the year. Indeed, the Company was nowhere near on pace to meet Medtronic's demand, and Integer would ultimately finish the year having made only 5,000 devices (versus the 8,000 promised and the 14,000 requested). Former Integer employees further confirmed that, by Fall 2024, Integer was still experiencing such severe manufacturing issues that it was apparent that the Company would not be able to manufacture sufficient quantities of PulseSelect for Medtronic—and ultimately, in November 2024, Medtronic was forced to publicly acknowledge that an unnamed "third-party component supplier interruption" had harmed the growth of PulseSelect. These ongoing severe manufacturing issues led Medtronic to return the vast majority of the PulseSelect devices that Integer made during this period; and, ultimately, cease to order additional products from Integer.

### C. Q3 2024 Earnings Release And Conference Call

118. On October 24, 2024, Integer issued a press release before market open reporting its financial results for the third quarter of 2024 ("Q3 2024 Earnings Release"). That same day, at market open, the Company held a conference call with analysts to discuss these results ("Q3 2024 Earnings Call"). In the Q3 2024 Earnings Release and during the Q3 2024 Earnings Call, Defendants again touted the Company's above market growth in the C&V segment, driven by EP products and "tailwinds" from new product ramps in the emerging, high-growth PFA market.

119. During the Q3 2024 Earnings Call, CEO Dziedzic represented that Integer was "confident in [its] ability to deliver strong sales growth" given the Company's "high visibility to customer demand, including ramping programs in high growth markets."

120. During the Q3 2024 Earnings Call, a Bank of America analyst asked Defendants to "go over the growth trends of your EP business over the last couple of quarters," specifically as it related to new product launches in PFA. In response, CEO Dziedzic affirmed that new product ramps in EP were driving Integer's above market growth, while again assuring investors that its growth was not at risk because it was not overly dependent on "one product or end market":

> So[,] electrophysiology is an exciting high-growth market. We are highly vertically integrated. We have a very strong position and footprint across the full procedure. And we expect it to continue growing, and we expect to be a strong participant. And so our outlook hasn't changed. Every day, I think, it gets brighter and brighter with the industry's progress. But I'll just highlight, it's one of many growth factors for us, and I would not expect any one product or end market to be the single biggest driver or materially change the company outlook. So[,] it's in our guidance as we continue to work with customers on their new product rollouts, we continue to factor that into our outlook.
>
> Our electrophysiology business continues to outperform the market. We track our customers' reported sales by end market. We then look at our sales by those end markets, and we're still growing 1.5-ish times the end market growth rate on a trailing 4-quarter basis, and we expect that to continue to accelerate as more and more products come to market.

121. Also during the Q3 2024 Earnings Call, a Piper Sandler & Co. analyst asked whether the Company's accelerating PFA sales could weigh on Integer's legacy EP business and require an "inventory work down" on the "traditional energy products." In response, CEO Dziedzic brushed aside such concern and touted that Integer was "incredibly well positioned to support the industry" during its transition to PFA and "help our customers bring products to market as fast as we all can," while affirming that PFA would be a "net tailwind" to Integer's EP business:

> Our customers continue to be very optimistic about the broader electrophysiology marketplace. And given our broad footprint and participation across the full procedure and given our significant vertical integration, we think we're incredibly

> well positioned to support the industry during this transition and help our customers bring products to market as fast as we all can on a safe basis. So we remain excited and don't -- haven't seen any meaningful shift beyond what you're hearing and seeing in the broader industry. And as we look at electrophysiology, given our broad footprint and vertical integration, we see it as a net tailwind for the company for sure.

122. The statements in ¶¶118-21 were materially false or misleading when made. *First*, as alleged further above at §IV(F), it was materially false and misleading to tout the Company's "outperform[ance]" and above-market growth in EP, its "tailwind" from EP, and its "confiden[ce] in [its] ability to deliver strong sales growth," when Integer was already dramatically failing to meet demand for its most critical EP product – Medtronic's PulseSelect PFA device, as confirmed by FE 1. Indeed, by the time of these statements, Integer had already experienced months-long delays in ramping up manufacturing PulseSelect, such that, by September 2024, manufacturing was only just starting up for the year. Indeed, by October 2024, the Company was nowhere near on pace to meet Medtronic's demand, and Integer would ultimately finish the year having made only 5,000 devices (versus the 8,000 promised and the 14,000 requested).

123. *Second*, it was materially false and misleading to claim that Integer was "well positioned" to "help our customers bring [EP] products to market as fast as we all can" when, at that very moment, Integer's manufacturing failures were *delaying* Medtronic's PFA product from getting to market, to the point that Medtronic was forced to publicly report in November 2024 (the following month) that a third-party supplier delay had halted Medtronic's growth in PulseSelect.

124. *Third*, it was materially false and misleading for Dziedzic to claim that he "would not expect any one product or end market to be the single biggest driver or materially change the company outlook." As Defendants revealed at the end of the Class Period, a single end market—EP—and a single product—Medtronic's PulseSelect—*was* a massive driver that *did* "materially

change the Company outlook." Indeed, when Integer lost Medtronic's PFA device business, its growth ground to a standstill for the foreseeable future.

### D. 2024 Piper Sandler 36th Annual Healthcare Conference

125. On December 3, 2024, Integer management presented at the Piper Sandler 36th Annual Healthcare Conference. During the conference, an analyst asked Dziedzic to "talk a little bit about the EP opportunity." In response, Defendant Dziedzic reiterated that PFA was a "tailwind" for Integer, explaining that the Company had been "growing 1.5 times the industry growth rate in electrophysiology," which Defendants expected "to continue and even accelerate" given Integer's position and capabilities in the burgeoning PFA market:

> Pulsed field ablation specifically gives us the opportunity to have more content on the ablation catheter step of the procedure, which helps us – contributes to our viewing <u>pulsed field ablation and electrophysiology holistically as a tailwind for us.</u> I commented on our last earnings call that we've been growing the last four quarters, which is how we measure our business to take out the noise of individual quarters. But <u>we've been growing 1.5 times the industry growth rate in electrophysiology and we expect that to continue and even accelerate moving forward given our vertical integration capability and the continued growth in PFA</u>.

126. The statements in ¶125 were materially false or misleading when made. Specifically, it was materially false and misleading to tout "pulsed field ablation and electrophysiology holistically as a tailwind for us" and to tout "1.5 times the industry growth rate in electrophysiology" and the "continued growth in PFA" when, at that very time, the exact opposite was happening. At the time of these statements, Integer was dramatically failing to meet Medtronic's purchase orders for the Company's most important PFA device, the PulseSelect, due to months-long delays and manufacturing deficiencies that were compromising the quality of the produced devices. Indeed, because the Company's products were claimed by Medtronic to be riddled with defects, former employees confirmed that around Thanksgiving 2024, Medtronic returned approximately 1,100 of the Integer-manufactured Medtronic PFA devices due to those

defects. And further, by the end of 2024, former employees confirmed that Medtronic had informed Integer that they were going to reduce demand for PulseSelect—and consistent with this, Medtronic ceased submitting further purchase orders. All of these issues so completely undermined Integer's PFA business that, just months later, the Company was forced to shut down the Medtronic PFA manufacturing line at the Company's Juarez site and fire over 100 employees at the site.

**E. Q4 And FY 2024 Earnings Release And Conference Call**

127. On February 20, 2025, before market open, Integer issued a press release reporting its financial results for the fourth quarter and full year of 2024 ("Q4 and FY 2024 Earnings Release"). That same day, at market open, the Company held an earnings conference call to discuss these results ("Q4 and FY 2024 Earnings Call"). In the Q4 and FY 2024 Earnings Release and during the Q4 and FY 2024 Earnings Call, Defendants continued to tout the Company's C&V sales growth, driven by continued strong growth in the critical EP industry.

128. In the Q4 and FY 2024 Earnings Release, Integer stated that "<u>Cardio & Vascular (C&V) sales increased 15% in the fourth quarter 2024 compared to fourth quarter 2023, driven by new product ramps in electrophysiology</u> and the Pulse acquisition." For the full year of 2024, the release similarly stated that "<u>[f]ull year sales increased 14% year-over-year, with strong growth across targeted C&V markets, driven by electrophysiology</u>, structural heart, and the InNeuroCo and Pulse acquisitions." In the release, CEO Dziedzic provided 2025 guidance, stating that "We expect 8% to 10% sales growth in 2025 and adjusted operating income to grow 11% to 16%. We continue to execute our strategy by launching new products and adding capabilities in targeted growth markets."

129. During the Q4 and FY 2024 Earnings Call, CFO Smith reiterated that the strong performance of the C&V segment was driven by new product ramps in EP, stating that "<u>[f]or our</u>

Cardio & Vascular product line, trailing 4-quarter sales increased 14% year-over-year with strong growth across targeted C&V markets," which "was driven by new product ramps in Electrophysiology and Structural Heart and the performance of our INeuroCo and Pulse acquisitions."

130. During the question-and-answer portion of the Q4 and FY 2024 Earnings Call, a KeyBanc analyst noted that the Company's C&V segment "saw a little bit of deceleration in 2024" and asked whether the Company saw the potential for a return to "that low double-digit range in 2025" and "if there's anything holding you back"? In response, CEO Dziedzic declared: "So, we absolutely do expect Cardiovascular to continue to have very strong growth given our success in the various targeted high-growth markets." A Bank of America analyst inquired, "with some of the high-growth markets that you're serving in EP and structural heart, it seems like . . . the underlying growth of those markets continue to accelerate. . . . [W]hy couldn't you maintain C&V growth closer to the mid-teens versus the low double digits that you're expecting?" In response, CEO Dziedzic underscored the Company's outperformance in the critical EP industry and indicated it could in fact return the Company to the low double-digit growth range, representing: "We're still outgrowing the market meaningfully in Electrophysiology and Structural Heart, and those are big contributors. . . . Low double-digit kind of has a range that could creep up into the range in the area that you're pointing to."

131. The statements in ¶¶127-30 were materially false or misleading when made. *First*, it was materially false and misleading to tout the Company's growth purportedly "driven by new product ramps in electrophysiology" and to tout the Company "outgrowing the market meaningfully in Electrophysiology," when, by the time of the statements, there was a complete lack of demand for Integer's two key EP products, including, in particular, the Company's critical

Medtronic PulseSelect product. Indeed, according to former employees, by this time, Integer's profound and intractable manufacturing delays and deficiencies sounded the death knell for the Company's PulseSelect business. Due to these issues, Medtronic had already informed the Company that demand had been reduced; ceased submitting new purchase orders for the device; returned thousands upon thousands of defective PFA devices that it had already purchased; and shifted its PFA focus to a second generation PFA product for which Medtronic did not select Integer as its manufacturer.

132. *Second*, for the same reasons, it was false or materially misleading for Dziedzic to reassure analysts about whether there was "anything holding [Integer] back" from returning to its prior "low double-digit" revenue growth range by responding that, in fact, "very strong growth" and "meaningful[]" outperformance in the EP industry could return the Company to that range, when, in reality, demand from Medtronic for its PulseSelect PFA device had already cratered, which was clearly "holding Integer back" from growing as much as it otherwise would.

**F. 2025 Raymond James Institutional Investors Conference**

133. On March 5, 2025, Integer management presented at the Raymond James Institutional Investors Conference. During the conference, an analyst questioned Defendant Dziedzic about customer concentration risk, requesting that Dziedzic "help frame" the risk and address "what's the biggest kind of single product or bill of goods exposure" for Integer. In response, Dziedzic acknowledged that Integer's top three customers—Medtronic, Abbott, and Boston Scientific—collectively represented approximately 47% of 2024 sales, but quelled concern that any one customer or product was "a meaningful driver" of the Company's growth:

> Yeah. This is a common question. So our top three customers in alphabetical order, Abbott, Boston Scientific, Medtronic, they're all three of them are 10% or more sales. So we have to publicly disclose those three. It's about 47% of our sales in 2024. As a percent of sales, they look like they're significant. We think that because we serve the whole industry, we think that's representative of their position in the

> industry as the three biggest players in Medtech. Way to think about it is we have hundreds of different programs with each of those customers. We serve each of those customers in the business unit and the markets that we serve.
>
> * * *
>
> And it's spread across many end markets. It's spread across hundreds of different programs. And so although it looks like concentration, it's actually very diversified. <u>And there's no single program that's a meaningful driver of the entire company</u>**.** We've talked about that a lot. <u>And I think that diversification is a strength of ours</u>.

134. The statements in ¶133 were materially false or misleading when made. Dziedzic's statement that "there's no single program that's a meaningful driver of the entire company," was materially false and misleading because, as Defendants revealed at the end of the Class Period, a single end market—EP—and a single product—Medtronic's PulseSelect—*was* a massive driver that *did* "materially change the Company's outlook." Indeed, when Integer lost Medtronic's PFA device business, the Company's sales growth ground to a standstill for the foreseeable future.

### G. 2025 KeyBanc Capital Markets Healthcare Forum

135. On March 19, 2025, Integer management presented at the 2025 KeyBanc Capital Markets Healthcare Forum. During the conference, an analyst asked Defendants to "qualitatively discuss how agnostic [Integer is] to potential changes in market share in PFA, as more new products reach the market," and whether "there [is] a major difference for Integer depending on who captures the most incremental share." In response, Defendant Dziedzic represented that Integer had the capability to "accelerate the introduction of pulse[d] field ablation" and was "well-positioned to help [its] customers continue to evolve" the PFA therapy, reiterating that PFA was a "tailwind" driving Integer's current and expected above-market growth in EP:

> And we are agnostic to how we're helping customers or whose device it is. <u>We believe we have the capability to help everyone in the industry for – accelerate the introduction of pulsed field ablation</u> and EP more broadly**.** At the end of the day, electrophysiology is no different than any of the other end markets we serve. We have different amounts of content on different customers' devices. And so, the

> direct answer is, it always matters who wins in terms of the content we have. I'd love to say we have 100% with everybody. That's just not realistic.
>
> And so, it certainly does matter. But we feel we are well-positioned to continue to support the electrophysiology market growth. We're well-positioned to help our customers continue to evolve the therapy, specifically pulsed field ablation and that it's a tailwind for us. We've been outgrowing the market and we expect to continue to outgrow the market in electrophysiology**.**

136. The statements in ¶135 were materially false or misleading when made. *First*, it was materially false and misleading to claim that the Company had the "capability to help everyone in the industry…accelerate the introduction of pulsed field ablation and EP more broadly" when, in reality, Integer's severe manufacturing issues had already *delayed* one of its top three customers, Medtronic, from entering the EP market with its PFA device, PulseSelect. *Second*, for similar reasons, it was false or materially misleading for Dziedzic to claim that the Company was "well-positioned to continue to support electrophysiology market growth" and to tout PFA as a "tailwind for us," when, by this time, Integer executives knew full well that Medtronic had not and would not put in any new PFA purchase orders for 2025. As a result, at minimum, tens of millions of dollars of EP revenue and the Company's future sales growth were likely evaporated, with no reasonable expectation of coming to fruition in the future.

### H. Q1 2025 Earnings Release And Conference Call

137. On April 24, 2025, before market open, Integer issued a press release reporting its financial results for the first quarter of 2025 ("Q1 2025 Earnings Release"). That same day, at market open, Integer held a conference call to discuss these results ("Q1 2025 Earnings Call"). In the Q1 2025 Earnings Release and during the Q1 2025 Earnings Call, Defendants continued to tout the Company's strong growth in the C&V segment, driven by new product ramps in its EP business, and continued to assure investors of the Company's "excellent visibility" into customer orders for the remainder of 2025 by citing its comprehensive "order book."

138. In the Q1 2025 Earnings Release, Integer stated that "Cardio & Vascular sales increased 17% in the first quarter 2025 [compared to the first quarter 2024], driven by new product ramps in electrophysiology and … acquisitions."

139. During the Q1 2025 Earnings Call, a Bank of America analyst noted that Defendants had "called out electrophysiology" as "an area of strength" for Integer "for a number of quarters," and asked Defendants to explain the growth in the C&V segment "relative to the market" and whether that growth was "accelerating." In response, CEO Dziedzic represented that "electrophysiology does continue to outgrow the markets very nicely," "pulsed field ablation is also an opportunity for us as we get higher – we're getting higher content on average on the ablation catheter in that step," and that electrophysiology "continues to be a strong contributor to our growth. We are growing above the market."

140. The statements in ¶¶137-39 were materially false or misleading when made. By the time of these statements, it was clear that (as was revealed at the end of the Class Period), Integer was *not* experiencing growth "driven by new product ramps in electrophysiology"; the Company's EP business would *not* "continue to outgrow the markets"; and PFA was *not* continuing to serve as an "opportunity" for the Company. Instead, by this time, Defendants knew full well that demand for the PulseSelect had cratered; Medtronic was not placing additional purchase orders whatsoever for 2025; and Medtronic had shifted its focus to a second generation PFA device that was not manufactured by Integer. As a result of these issues, the Company would be forced to shut down its entire Medtronic PFA product manufacturing line and fire the employees responsible for running it.

**I. May 2025 Bank of America Healthcare Conference**

141. On May 14, 2025, Integer management participated at the BofA Securities 2025 Healthcare Conference. During the conference, a BofA analyst asked "what was really driving"

the Company's reported 6% organic growth during Q1 2025? CEO Dziedzic responded that growth in the C&V segment continued to be driven by "new product launches," stating in relevant part: "We're seeing the growth in the end markets that we've targeted, the new product launches that are -- that have been driving the growth, continue to drive the growth and have confidence as we look forward to the rest of the year."

142. Later in the conference, the BofA analyst asked about the Company's "growth algorithm" for its "$1 billion" Cardio & Vascular business, specifically, the relative contribution in EP between PFA products versus traditional RF products. COO Khales reiterated that PFA remained a "tailwind" driving the Company's growth across the entire EP market, stating in relevant part:

> So I think that just as a context, we have a very broad range of capabilities and a broad range of participation in the different products in the core markets that we participate. Why that matters is you give the example of PFA. Obviously, that's a general grower in the market right now. So let me talk about that for a moment. PFA is a tailwind for us because it is driving growth in the market. We participate in almost every aspect of a procedure. Anything from access from the beginning to when you do a transseptal crossing, we have participation in that with different customers. When you do that, when you do diagnostics, for example, when you do the actual ablation itself, we participate in all of that. So when that industry grows, again, that's all part of our strategy to make sure that we are a very strong player in those core markets. So we've had these participations for a number of years. So when there's a tailwind, obviously, that drives growth everywhere right across that market."

143. The statements in ¶¶141-42 were materially false or misleading when made. As alleged further above, by the time of the above statements, PFA was clearly not "driving growth" for Integer and was not a "tailwind." Instead, by this time, Medtronic had put in no PFA purchase orders whatsoever for 2025 and already returned thousands of the devices it had already received, and Integer was already on the verge of shutting down its entire Medtronic PFA product manufacturing line. Further, in April 2025, just weeks before the above statements were made,

Medtronic informed Integer that they were going to significantly slow down production, and the impact of this slowdown was so severe that the Company made the decision to shut down its entire Medtronic PulseSelect production line by no later than June 2025. Indeed, mere months later, Integer would announce that the utter *lack* of demand for its PFA products meant that Integer would experience no sales growth whatsoever in 2026.

**J. June 2025 Truist Securities MedTech Conference**

144. On June 17, 2025, Integer management presented at the Truist Securities MedTech Conference. During the conference, an analyst asked whether the Company's "impressive" projected "low to mid-teens growth rate" for the C&V segment was sustainable given that "electrophysiology is a big piece of it." Defendant Khales reassured that the burgeoning PFA market continued to be "a tailwind for [Integer] in terms of growth," responding in relevant part:

> So, when you think about EP in particular, what's happening in the industry with PFA, it says – it's creating a lot of momentum in the industry, also by extension to us just because we've had such a strong presence in that industry for years. So, we believe that that is a contributor to and that's a tailwind for us in terms of growth.

145. Also during the conference, an analyst highlighted PFA as "the big new product category" in EP and asked how Integer could "tap into and benefit from that specifically," particularly as more players enter the market. In response, COO Khales continued to assure that Integer was capitalizing on the growing PFA market, reiterating that it was a "tailwind" to the Company's growth in EP:

> Yeah, let me take that as well. So, without being specific, which I'm sure you understand, our OEM customers do not want us to talk about – or they don't want the market to know who's making the products for them. So, I'm sure you appreciate that. So, I'll be a little bit less specific. But given just maybe some statistics, you're talking about the market growth in general. So, some players in the industry recently mentioned that they believe that the EP market in general can double in size over the next five years to $20 billion. That's a total addressable market for the OEM. So, obviously, that creates a lot of momentum and tailwind. And just for a company like us that participates in that, that's incredibly helpful.

146. The statements in ¶¶144-45 were materially false or misleading when made. As alleged further above, by the time of the above statements, Medtronic had returned thousands of PulseSelect devices due to purported defects, and had put in no PFA purchase orders whatsoever for 2025. Indeed, by no later than June 2025, Integer was already preparing to shut down its entire Medtronic PFA manufacturing line, which it would then do the next month, in July 2025, firing over 100 employees in the process. Moreover, far from being a "tailwind" for the Company's growth, Integer had lost its entire business for its most critical PFA product (PulseSelect), which was the only full PFA device (as opposed to mere components) that Integer manufactured at the time. Meanwhile, Integer was not involved in Medtronic's second generation PFA product, which was dominating the PFA market. Consequently, Defendants would reveal only four months later that the severe *lack* of demand for PFA products meant that Integer would experience no sales growth whatsoever in 2026.

### K. Q2 2025 Earnings Release and Conference Call

147. On July 24, 2025, before market open, Integer issued a press release reporting its financial results for the second quarter of 2025 ("Q2 2025 Earnings Release"). Later that same day, at market open, Defendants held a conference call to discuss the results ("Q2 2025 Earnings Call"). In the Q2 2025 Earnings Release and during the Q2 2025 Earnings Call, Defendants continued to tout the Company's strong sales growth in C&V driven by new product ramps in EP.

148. In the Q2 2025 Earnings Release, Integer stated that "Cardio & Vascular sales increased 24% in the second quarter 2025 compared to the second quarter 2024, driven by new product ramps in electrophysiology." During the Q2 2025 Earnings Call, CEO Dziedzic touted the Company's strong second quarter performance, including a 9% increase in sales and a 14% increase in operating profit, "or 1.5x the rate of sales growth." Dziedzic again emphasized

Integer's "strong pipeline of new products concentrated in faster-growing end markets." Given the Company's strong performance, Dziedzic highlighted that the Company was raising its full year profit and earnings guidance for 2025, stating: "With the first half now behind us, we are raising the midpoint of our adjusted operating income and EPS outlook. We are maintaining our sales outlook midpoint given our high visibility to customer demand while tightening the sales range. At the midpoint of our full year outlook, we expect to grow sales 8.5%, adjusted operating income 14%, and adjusted EPS 20%."

149. During the Q2 2025 Earnings Call, an analyst commented on Integer's "very strong quarter in C&V," noting that Khales had "called out the electrophysiology product ramp" and questioned "how sustainable the EP growth specifically is over the next several quarters." Khales confirmed that Integer was "outperform[ing] the market" in EP and specifically highlighted the Company's "strong pipeline," "good momentum," and "tailwinds" from PFA:

> Let me just highlight that we have been present in EP for many, many years. We have built a lot of capabilities over the years. And our participation in EP, I mean, there's a lot of, obviously, a lot of excitement in the market right now with EP with PFA, that's kind of driving a lot of growth, which is also great for patients. We're very excited about the technology. That's been driving – it's been giving us some tailwinds. I would highlight that our participation in EP is really across the procedure. It's not just only in the ablation technology itself. We participate in access, in guidewires and transseptal sheaths in diagnostics and of course, the ablation itself. So, we have good content across the procedure, and that includes a PFA pulsed field ablation. So, we have good momentum in that space, and we've got a strong pipeline. You mentioned whether we are outperforming the market. Yes, we believe we are. If you look at our trailing four quarter within C&V, that is one of the drivers of the growth that we have, and we believe that we are outperforming the market, and we continue to be very excited about the momentum that we have.

150. The statements in ¶¶147-49 were materially false or misleading when made. As alleged further above, by the time of these statements, Integer had already been forced to entirely shut down its Medtronic PFA manufacturing line due to a complete lack of demand from

Medtronic. Indeed, a mere three months later, Defendants would entirely reverse their growth outlook, lowering their guidance for 2025 and forecasting zero sales growth in 2026 due to a lack of demand in two key EP products (one of which was Medtronic's PulseSelect).

**L. 2025 Wells Fargo Healthcare Conference**

151. On September 4, 2025, Integer management presented at the 2025 Wells Fargo Healthcare Conference. During the conference, an analyst noted that PFA-related procedures and product sales were growing approximately "15%" and asked whether Integer was growing "1.5 times" that rate. Defendant Khales answered in the affirmative, stating in relevant part: "[A]s the number of procedures grow, we see that that gives us tailwind in general. As it relates to the ablation device specifically – so, the PFA technology is cannibalizing some of the more legacy, RF and cryo technologies, in general. And we see that too in our space. But net-net, we're positive on the PFA device itself, on the PFA devices themselves. So, net-net, it's a positive for us. Both for ablation and also everything else that we participate in."

152. The statements in ¶151 were materially false or misleading when made. As alleged further above, by the time of these statements, it had already been at least two months since Integer had already been forced to entirely shut down its Medtronic PFA manufacturing line due to a complete lack of demand from Medtronic. Indeed, a mere six weeks after these statements, Defendants would entirely reverse their growth outlook, lowering their guidance for 2025 and forecasting zero sales growth in 2026 due to a lack of demand in two key EP products (one of which was Medtronic's PulseSelect).

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

153. *Integer touted the EP market and PFA devices as critical to its growth strategy, and Defendants and investment analysts focused intently on them every quarter.* As set forth further above, in virtually every earnings call and investor conference throughout the Class Period, Integer

focused on its EP products, and specifically PFA, as critical growth drivers for the Company. Defendants repeatedly touted the "tailwind" they expected from EP and PFA and the "above market growth" they were experiencing in the field.

154. Similarly, analysts focused intently on Integer's exposure to EP and PFA, singling out PFA as a particularly "hot topic," and emphasized that Integer was "well positioned" to benefit from the growing PFA market due to its "vertical integration," and "ability to accelerate customer speed to market," and ability to "provide more cost-efficient production and assembly, given its scale," reporting that "PFA is one of the more exciting and closely watched new product cycles in MedTech and ITGR's growing exposure to the electrophysiology (EP) supply chain, including incorporation into PFA product development," which "has put the spotlight on the potential for this exciting new category to drive increased momentum for ITGR," and opining that "based on our conversations with ITGR mgmt., we think its safe to assume that ITGR has (or will have) some involvement with all major anticipated PFA players." Analysts further opined, based on management's representations, that "PFA will be a solid multi-year tailwind for the company," and fully accepted management's representations that Integer's growth was not at risk from over-concentration in EP or PFA, noting that "ITGR indicated no single product or category will be an outsized driver of growth."

155. *Former employees confirmed that Defendants had information contradicting their statements at the times at which they were made*. As set forth further above, former employees directly involved in the manufacture of Medtronic's PFA confirmed that Integer's critical business with Medtronic for its PFA product was already experiencing severe negative impacts by the times of each of Defendants' statements throughout the Class Period.

156. For example, by the start of the Class Period in July 2024, Integer was already severely behind schedule in getting its Medtronic PFA manufacturing line running in Juarez and was struggling to stabilize the process. This delay lasted until at least September 2024, and was so severe that it forced Medtronic to publicly report in November 2024 that its PulseSelect growth had been hampered by an unnamed third-party supplier failure. Integer then only started manufacturing PulseSelect at the end of Q3 2024, and was only able to manufacture a fraction of the devices Medtronic had requested.

157. Then, by Thanksgiving 2024, Medtronic began returning already-produced PFA devices to Integer, and continued returning devices in early 2025. Medtronic further did not put in any 2025 purchase orders whatsoever, and warned Integer that, at best, it was sharply reducing its demand for 2025. Finally, by no later than June 2025, Integer was forced to make the decision to shut down its entire Medtronic PFA manufacturing line due to the lack of demand—which it did in July 2025, laying off over 100 employees.

158. Former employees confirmed that Integer's most senior executives, including the Individual Defendants, knew of these developments and had access to detailed information about the sales forecasts for Integer's Juarez facility and Medtronic's PulseSelect. For example, FE 1 was part of a process to gather data for monthly operational site reviews for Juarez, in which data on the site's operations and revenue forecasts was gathered and then presented during virtual calls on the second Tuesday of every month. FE 1 explained that Defendant Khales and various senior finance executives participated in these calls. FE 1 explained that in advance of these reviews, she was responsible for color-coding revenue as either green (low risk), yellow (medium risk), or red (high-risk). FE 1 explained that, due to the Company's problems with the Medtronic PFA, by Q4

2024, FE 1 was marking the site's 2025 forecasted Medtronic PFA revenue as red, because it was not supported by purchase orders and because Medtronic was returning product.

159. FE 1 explained that, beginning in Q4 2024, executive leadership, including COO Khales, began asking questions about the 2025 Medtronic PFA forecast revenue during the monthly Operational Site Reviews. FE 1 explained that typically 95% of her revenue forecast for the following quarter would have been supported by a purchase order, but that, because Integer did not have a purchase order from Medtronic for 2025, roughly 50% of her total forecasted Juarez revenue for 2025 was in red—meaning at risk and not supported by a purchase order. FE 1 confirmed that she explained to Khales and the other executives that they were experiencing returned devices from Medtronic and Medtronic was not issuing any more purchase orders, and said that she "included that we did not have POs supporting this demand." FE 1 emphasized that the "red lights were flashing," which executive leadership saw first-hand. FE 1 further confirmed her 2025 revenue forecasts continued to show the Medtronic PFA revenue for 2025 in red throughout the end of her tenure with Integer in July 2025.

160. FE 1 also explained that VP Blasey typically escalated major customer issues to the Company's senior executives.

161. FE 1 also explained that revenue forecasts were available to, and were regularly reviewed by, executive management in an Oracle ERP module known as Power BI, which was updated overnight. She said that executive leadership could therefore see that only 50% of the Medtronic PFA revenue was covered by POs, which was highly unusual since forecasts were based on POs, and they typically had no more than 5% of unsecured POs within a three-month period. She added, "By Q4 2024 it was showing that 50% of our revenue was not secured by POs from Medtronic."

162. FE 1 stated that Denise Blasey was responsible for the Medtronic and Abbott accounts, and she handled all escalations with those accounts with executive leadership. She said that Blasey had weekly calls with the customers. She explained that once production started, Integer's VP and SVP of Operations, had regular calls with Medtronic.

163. FE 2 similarly explained that the decision to shut down Medtronic PFA production at Juarez and to lay off over 100 employees would have to have been made at the executive leadership level, because such decisions could not be made at the site level.

164. FE 2 also was aware of weekly site review meetings for each site (including Juarez) that were attended by both Defendant Dziedzic and Defendant Khales, as well as other executive leadership. FE 2 said that revenue issues impacting the sites were discussed at these meetings.

165. *Defendants claimed to have "tremendous visibility" into demand due to their "strong order book," and thus analysts doubted management's explanation that they had only recently learned of the demand decline at the end of the Class Period.* Defendants represented throughout the Class Period that they had "tremendous visibility" into their sales going forward, with a "strong order book" that reflected their "backlog" of sales 12 or even 18 months in advance. Indeed, when the truth emerged at the end of the Class Period, analysts openly doubted Defendants' explanation that they had only learned of the decline in demand for their EP products in the most recent quarter. For example, Oppenheimer analysts noted that "by definition[] there are demand schedules established" through which Integer "come[s] up with [its] backlog," and thus questioned Khales during the Company's Q3 2025 earnings call: "you say your backlog is largely unchanged, but two EP customers are seeing softness. So, I'm struggling to reconcile the contractual arrangements versus the suddenness of the demand curve moving leftward." Citi analysts similarly questioned: "What just happened?" Citi further noted it was "odd" that demand for multiple

critical products would suddenly crater at the exact same time, concluding that "[c]learly there is some explaining that needs to be done." Similarly, Wells Fargo expressly noted that Defendants "did not flag any EP issues at our Healthcare Conference on Sept[ember] 8"—*i.e.*, just six weeks prior when Khales instead reassured investors of Integer's continued PFA "tailwind."

166. *Defendant Dziedzic's stock sales support scienter.* Defendant Dziedzic's abrupt decision to sell nearly 90% of his stock in a single day supports scienter. Dziedzic sold virtually all of his total vested Integer shares both held and acquired during the Class Period—at prices between $122.45 and $126.18 per share, generating proceeds of almost $42 million, and due to the low exercise cost of these shares (just approximately $3.1 million in total), this massive stock sale was almost pure profit, yielding Dziedzic a total of roughly $38.6 million in windfall profits. Dziedzic undertook this massive sale after not having sold a single share of stock for eight years, making it highly unusual compared to his prior trading (or lack thereof).

167. Moreover, Dziedzic's stock sales were suspiciously timed, coming just after Integer lost its critical Medtronic PFA business and only one week after Defendants announced Dziedzic's retirement, while simultaneously assuring investors the Company's EP business was "continu[ing] to outgrow the markets" and that the Company's "above the market" growth in this business was sustainable. Further, Dziedzic's sales were made near the Class Period high, with no 10b5-1 plan in place, and there was no requirement or other urgent reason for him to sell at this time, five months in advance of his retirement and nearly a year before he was slated to leave the Company.

## VII. LOSS CAUSATION

168. During the Class Period, shares of Integer's publicly traded securities traded on the NYSE. The market for shares of Integer's securities was open, well-developed and efficient at all relevant times. Throughout the Class Period, the price of Integer's securities was artificially inflated as a result of Defendants' materially false and misleading statements and omissions

identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Integer securities, by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Integer securities fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Integer securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

169. By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Integer's business. Defendants' false and misleading statements had the intended effect and caused Integer's securities to trade at artificially inflated levels throughout the Class Period.

170. On October 23, 2025, before market open, Defendants released disappointing financial guidance, which it attributed entirely to the fact that the Company "expect[ed] sales of [three] new products to decline in 2026," with two of three being "electrophysiology [EP] products." Although Defendants refused to identify the specific products or customers involved, Khales stated that "the market adoption of these products has been slower than forecasted" and projected a substantial "3% to 4% headwind to [Integer's] total company sales for [2026]" as a result. During the earnings call that day, Defendants revealed that as a result of these headwinds, sales growth was expected to be flat in 2026, with an "organic sales *decline*" in the first half of 2026, and a return to at-market growth anticipated only in the second half of 2026, and any above-market growth pushed out to 2027 at earliest. Specifically, the slide presentation accompanying the call warned investors to "[e]xpect approx. flat 2026 sales, with a return to above-market growth

in 2027," and disclosed that organic sales were expected to be "down low single-digit in 1H" of 2026, and only "recover to market growth during 2H" of 2026.

171. On this news, the Company's stock price plummeted $35.22 per share, from a closing price of $109.11 per share on October 22, 2025, to a closing price of $73.89 per share on October 23, 2025, a decline of over 32% on extraordinary trading volume.

172. Analysts directly attributed the stock price decline to the news about reduced demand for the Company's EP products, and linked the disclosures to Defendants' prior statements. For example, Citi downgraded Integer's stock and slashed its price target nearly in half, from $140 to $77 in a report titled "Ok Quarter, Disappointing Guide (to Say the Least)," and cited Integer's "underwhelming outlook for next year, in our view, with many unanswered questions." Similarly, Wells Fargo downgraded Integer stock and noted that Defendants "did not flag any EP issues at our Healthcare Conference on Sept[ember] 8"—*i.e.*, just six weeks prior when Khales instead reassured investors of Integer's continued PFA "tailwind." Likewise, Truist issued a report that same day slashing its price target on Integer stock from $121 to $81, and questioned why Integer appeared "more susceptible to aberrations" in its sales growth than investors had previously been led to believe, and asking pointedly: "Why is that?" Similarly, Benchmark Equity Research issued a report lowering its rating from "Buy" to "Hold," citing Integer's "flat-to-lower" outlook for 2026 due to "reduced demand for three products that the Company manufactures" and noting that this guidance reduction was "most damaging" to investor confidence.

173. Bank of America analysts expressly noted that the overall EP market was growing rapidly, and thus inferred that Integer's failures were Company-specific, rather than tied to overall demand. Specifically, Bank of America observed that Integer's growth had slowed even as the EP "market exploded," and concluded that Integer "does not appear to be tied to the winning product."

And Citi identified the same disconnect, noting that the Company had previously promised it was insulated from risk by its diversification of products, but that, in reality, this had not panned out.

## VIII. PRESUMPTION OF RELIANCE

174. At all relevant times, the market for the Company's securities was an open, efficient and well-developed market for the following reasons, among others:

a) Integer's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, Integer filed periodic reports with the SEC and the NYSE;

c) Integer regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Integer was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

175. As a result of the foregoing, the market for Integer's securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's securities. All investors who purchased the Company's securities during the Class Period suffered similar injury through their purchase of Integer's securities at artificially inflated prices, and a presumption of reliance applies.

176. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Integer's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

177. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

178. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those

statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Integer who knew that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

179. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased Integer common stock between July 25, 2024 and October 22, 2025, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Integer at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

180. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds if not thousands of members of the proposed Class. Throughout the Class Period, Integer's shares were actively traded on the NYSE, an open and efficient market, under the symbol "ITGR." Millions of Integer shares were traded publicly during the Class Period on the NYSE. As of February 14, 2025, the Company had more than 33.6 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by the Company and/or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

181. Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

183. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Integer;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Integer;

e) whether the market price of Integer shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

184. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants**

185. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

186. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Integer shares; and (iii) cause Lead Plaintiff and other members of the Class to purchase Integer shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

187. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Integer shares in violation of Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

188. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Integer's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Integer's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Integer and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

189. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management

team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

190. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Integer's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

191. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Integer shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other members of the Class purchased Integer securities during the Class Period at artificially inflated prices and were damaged thereby.

192. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Integer was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their Integer securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

193. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

194. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

195. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

196. The Individual Defendants acted as controlling persons of Integer within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and

misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

198. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XII. PRAYER FOR RELIEF

199. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIII. JURY DEMAND

200. Lead Plaintiff demands a trial by jury.

Dated: April 10, 2026

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

Maya Saxena
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
msaxena@saxenawhite.com
lhooker@saxenawhite.com

David R. Kaplan
Emily Bishop
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

*/s/ Steven B. Singer*
Steven B. Singer