UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PEMBROKE PINES PENSION FUND FOR
FIREFIGHTERS AND POLICE OFFICERS, on
behalf of itself and all others similarly situated,

Plaintiff,

v.

INTEGER HOLDINGS CORP., JOSEPH W.
DZIEDZIC, DIRON SMITH, and PAYMAN
KHALES,

Defendants.

No. 1:25-cv-10251-JSR

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000

*Attorneys for Defendants Integer Holdings Corporation, Joseph W. Dziedzic, Diron Smith, and Payman Khales*

# TABLE OF CONTENTS

P<small>AGE</small>

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND .................................................................................................3

     A.    Integer's Business .............................................................................................3

     B.    Integer's Disclosures About Customer Demand and Operational Risks ................4

     C.    Integer's Relevant Period Performance ...........................................................5

     D.    October 2025 Disclosure of New Guidance for 2026 ..............................................6

     E.    The AC's Allegations ..........................................................................................7

ARGUMENT ...........................................................................................................................9

I.    PLAINTIFF FAILS TO PLEAD A FALSE OR MISLEADING STATEMENT ...............9

     A.    Statements About Integer's Past Performance Were Not False or Misleading........................................................................................................9

     B.    Statements About Integer's Future Growth Prospects Were Not False or Misleading.......................................................................................................10

     C.    Statements About Integer's Visibility into Customer Demand and Diversification of Its Product Portfolio Were Not False or Misleading ...............13

          1.    "Visibility" into Demand ..........................................................................13

          2.    Diversification of Product Portfolio............................................................14

     D.    None of the Challenged Statements Were Misleading by Omission.....................15

II.    PLAINTIFF FAILS TO PLEAD THE REQUISITE STRONG INFERENCE OF SCIENTER .......................................................................................................................17

     A.    The AC Does Not Plead Any Legally Cognizable Motive Allegations ................17

     B.    The AC Does Not Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.................................................................................18

          1.    The Allegations of Purported Manufacturing Difficulties at a Single Plant Do Not Plead a Strong Inference of Scienter .......................19

2.    Plaintiff's Remaining Circumstantial Allegations Fail..............................23

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ....................................................23

IV.    PLAINTIFF'S CONTROL PERSON CLAIM FAILS......................................................25

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE</small>(<small>S</small>)

*Acito v. IMCERA Grp, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................................. 14

*In re Adient PLC Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ....................................................... 12

*In re Adobe Inc. Sec. Litig.*,
   2025 WL 936416 (S.D.N.Y. Mar. 27, 2025) ...................................................... 12

*Alaska Laborers Emps. Ret. Fund v. Scholastic Corp.*,
   2011 WL 3427208 (S.D.N.Y. Aug. 3, 2011) ...................................................... 24

*In re AppHarvest Sec. Litig.*,
   684 F. Supp. 3d 201 (S.D.N.Y. 2023) ................................................................ 20

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) .............................................................................. 17

*In re AT&T/DirecTV Now Sec. Litig.*,
   480 F. Supp. 3d 507 (S.D.N.Y. 2020) ............................................................... 20

*In re Avon Prods., Inc. Sec. Litig.*,
   2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) ...................................................... 18

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
   2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ..................................................... 14

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................... 17

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*,
   2012 WL 685344 (N.D. Cal. Mar. 2, 2012) ...................................................... 14

*Chen v. Missfresh Ltd.*,
   701 F. Supp. 3d 236 (S.D.N.Y. 2023) ............................................................... 16

*City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*,
   2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024) .............................................. 15, 25

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*,
   655 F. Supp. 2d 262 (S.D.N.Y. 2009) ........................................................... 13, 14

*City of Taylor Gen. Empls. Ret. Sys. v. Magna Int'l, Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013) ............................................................... 18

*In re Duane Reade Inc. Sec. Litig.*,
   2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)................................................................ 10

*Finger v. Pearson PLC*,
   2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019) ...................................................... 15

*Golesorkhi v. Green Mt. Coffee Roasters, Inc.*,
   973 F. Supp. 2d 541 (D. Vt. 2013) ...................................................................... 14

*Gru v. Axsome Ther., Inc.*,
   2023 WL 6214581 (S.D.N.Y. Sept. 23, 2023) ...................................................... 16

*Hawes v. Argo Blockchain PLC*,
   2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ........................................................ 12

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021) ................................................................ 18

*Klein v. Goetzmann*,
   745 F. Supp. 107 (N.D.N.Y. 1990) ..................................................................... 14

*Koplyay v. Cirrus Logic, Inc.*,
   2013 WL 6233908 (S.D.N.Y. Dec. 2, 2013) ....................................................... 18

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ........................................................................ 23, 25

*Long v. Stellantis N.V.*,
   2026 WL 710406 (S.D.N.Y. Mar. 13, 2026) ...................................................... 11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ............................................................................... 23

*In re Miniso Grp. Holding Ltd. Sec. Litig.*,
   2024 WL 759246 (S.D.N.Y. Feb. 23, 2024) ...................................................... 23

*Nadoff v. Duane Reade, Inc.*,
   107 F. App'x 250 (2d Cir. 2004) ....................................................................... 10

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................... 10

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................................................... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................................................................... 12

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ............................................................................... 24

iv

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................................ 25

*In re Platinum-Beechwood Litig.*,
427 F. Supp. 3d 395 (S.D.N.Y. 2019) ......................................................................... 9

*Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*,
886 F. Supp. 2d 328 (S.D.N.Y. 2012) ........................................................................ 24

*Robeco Cap. Growth Funds v. Peloton Interactive, Inc.*,
665 F. Supp. 3d 522 (S.D.N.Y. 2023) ........................................................................ 12

*In re Rockwell Med., Inc. Sec. Litig.*,
2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ............................................................ 23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..................................................................................... 10

*Russo v. Bruce*,
777 F. Supp. 2d 505 (S.D.N.Y. 2011) ....................................................................... 17

*S. Cherry St. v. Hennessee Grp.*,
573 F.3d 98 (2d Cir. 2009) ....................................................................................... 18

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
75 F.3d 801 (2d Cir. 1996) ....................................................................................... 17

*In re Shanda Games Ltd. Sec. Litig.*,
128 F.4th 26 (2d Cir. 2025) ........................................................................................ 9

*Schiro v. Cemex*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019) ........................................................................ 21

*Shapiro v. TG Theraps. Inc.*,
652 F. Supp. 3d 416 (S.D.N.Y. 2023) .................................................................. 12, 25

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010) ..................................................................................... 11

*Smith v. Purecycle Techs.*,
2024 WL 5186586 (S.D.N.Y. Dec. 20, 2024) ............................................................ 11

*Steinberg v. Ericsson LM Tel. Co.*,
2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ............................................................ 20

*In re Supercom Inc. Sec. Litig.*,
2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ........................................................ 20, 21

*In re Teladoc Health, Inc. Sec. Litig.*,
2025 WL 886934 (S.D.N.Y. Mar. 21, 2025) .............................................................. 18

*Tellabs v. Makor Issues & Rts.*,
 551 U.S. 308 (2007) ........................................................................................... 17

*In re Time Warner Inc. Sec. Litig.*,
 9 F.3d 259 (2d Cir. 1993) .................................................................................... 16

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016) ................................................................................. 3

*Trustpilot Damages LLC v. Trustpilot, Inc.*,
 2021 WL 2667029 (S.D.N.Y. June 29, 2021) ..................................................... 21

*In re UiPath, Inc. Sec. Litig.*,
 2025 WL 2065093 (S.D.N.Y. July 23, 2025) ...................................................... 19

*Wilbush v. Ambac Fin. Grp., Inc.*,
 271 F. Supp. 3d 473 (S.D.N.Y. 2017) ........................................................... 10, 23

## STATUTES & RULES

15 U.S.C. § 78...................................................................................... *passim*

17 C.F.R. § 240.10b-5...............................................................................9

Fed. R. Civ. P. 9 ..................................................................................... 9

Defendants Integer Holdings Corporation ("Integer"), Joseph W. Dziedzic, Diron Smith, and Payman Khales (collectively, the "Individual Defendants," and, together with Integer, "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss Plaintiff's Amended Complaint (the "AC").

## PRELIMINARY STATEMENT

Integer is a medical device contract manufacturer. Like all contract manufacturers, its financial performance and outlook depend on orders it receives from its customers, which in turn depend on end-user demand. In 2024 and into 2025, Integer delivered significant sales growth. But in October 2025, Integer announced that—although its sales for the prior quarter had met forecasts—it expected *future* sales in certain areas to be slower, based on information it had learned from customers during the quarter. Specifically, although Integer expected to continue largely to meet sales expectations through the remainder of 2025, it anticipated slower growth in 2026. After Integer provided this forward-looking guidance, its stock price fell, and this lawsuit predictably followed, seeking to attribute Plaintiff's investment losses to allegations of securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff does not contend that any aspect of Integer's financial reporting was false or misleading. Nor does Plaintiff challenge Integer's actual forecasts, which are textbook forward-looking statements protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor. In that respect, Integer clearly identified its forecasts as forward-looking and paired them with references to detailed cautionary language, including that its future performance depended on customer order patterns, market adoption, and other factors outside Integer's control.

Instead, Plaintiff takes issue with isolated, optimistic words and phrases about how certain areas provided "tailwinds" and "good momentum." It also contends that generalized statements about its "visibility" into customer demand or a reference to Integer not being dependent on a

single product or customer were also somehow fraudulent.

These claims fail for three, independent reasons. *First*, Plaintiff has failed to plead that any challenged statement was false or misleading. The challenged statements fall into familiar, nonactionable categories. Most are either accurate statements of past performance, forward-looking statements protected by the PSLRA's safe harbor, or inactionable statements of corporate optimism. For the remainder—statements about visibility into demand and diversification of Integer's portfolio—Plaintiff does not plead that these statements were false or misleading when made, much less with the particularity required by the PSLRA.

*Second*, Plaintiff has failed to plead facts giving rise to a strong inference of scienter. Plaintiff's sole motive allegation is a single stock sale by Integer's former CEO one week after Integer announced his retirement and its first quarter earnings for 2025, and nearly six months before the alleged corrective disclosure. That is not suspicious, particularly where the other Individual Defendants *increased* their Integer holdings during the alleged class period of July 25, 2024 to October 22, 2025 (the "Relevant Period"). Plaintiff's remaining scienter allegations rely on two former, non-management employees from a manufacturing facility in Mexico. Neither is alleged to have participated in investor communications, company-wide forecasting, or SEC reporting, and neither had any meaningful contact with the Individual Defendants. Their anecdotal and internally inconsistent observations about operational issues at one of Integer's approximately two dozen facilities do not support a strong inference that any statement was made with scienter.

*Third*, Plaintiff fails to plead loss causation. Integer's announcement of forward-looking guidance for 2026 in October 2025 did not "correct" any of the prior statements about then-current demand, diversification, or anything else. Plaintiff has not pled the materialization of an undisclosed risk; nor could it in light of Integer's extensive risk disclosures.

Because of each of these pleading failures, the AC should be dismissed with prejudice.

## FACTUAL BACKGROUND[1]

### A.      Integer's Business

Integer is a medical device contract development and manufacturing company.  AC ¶ 27. Integer's customers are original equipment manufacturers ("OEMs") that "develop medical devices for regulatory approval and commercial distribution," and "contract with Integer to manufacture either finished medical devices or specific components for devices."  *Id.* ¶ 27.  Integer does not sell or market products directly to end customers.  Ex. 1 (2/20/25 10-K) at 6.[2]

Integer's manufacturing operations are organized within three core product lines—cardio and vascular ("C&V"), cardiac rhythm management and neuromodulation ("CRM&N"), and "Other Markets."  AC ¶ 28; Ex. 1 (2/20/25 10-K) at 4-6.  Integer has over 20 production facilities supporting different customers and product lines in the United States, Uruguay, Mexico, Ireland, Malaysia, the Dominican Republic, and Costa Rica.  Ex. 1 (2/20/25 10-K) at 8, 32, 35.

C&V is Integer's largest product portfolio.  AC ¶ 28.  Within C&V, Integer manufactures products and components for dozens of customers in a number of medical markets—including structural heart, vascular and interventional cardiology, and electrophysiology ("EP"), which encompasses emerging therapies like pulsed field ablation ("PFA")—for use in a variety of procedures.  Ex. 1 (2/20/25 10-K) at 4-5; *see* Ex. 2 (10/23/25 Earnings Call ("EC")) at 12.  Plaintiff alleges that Integer had a significant presence within the EP field, AC ¶ 1, and that it disclosed its "vertical integration" and "strong position and footprint across the full procedure," *id.* ¶¶ 120-21.

---

[1] References to "Ex. []" are to the declaration of Edmund Polubinski filed concurrently herewith.

[2] On a motion to dismiss, the Court may consider "statements or documents incorporated into the complaint by reference, [and] legally required public disclosure documents filed with the SEC." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

As Integer disclosed, its confidentiality obligations to customers prevented it from identifying exactly which products it manufactured and for whom.  *Id.* ¶ 34; *accord* Ex. 2 (10/23/25 EC) at 11 ("[B]ecause of the confidentiality that we have with our customers . . . I can't be overly specific [such] that the product is identifiable[.]").  But Integer disclosed that it routinely contracted with the three largest OEMs—Medtronic, Abbott Laboratories, and Boston Scientific—to manufacture finished devices and components in multiple fields.  AC ¶¶ 29-30; *see also* Ex. 1 (2/20/25 10-K) at 6 (describing "diversification" within those "three customers").

**B.   Integer's Disclosures About Customer Demand and Operational Risks**

Integer disclosed that its financial performance depends heavily on its customers, as well as the demand and market adoption for its customers' products.  Ex. 1 (2/20/25 10-K) at 16, 20.  Throughout the Relevant Period, Integer noted that its financial performance could fall short based on customer ordering patterns, end-user demand, and broader market dynamics.  *See, e.g.*, AC ¶ 29; Ex. 3 (7/25/24 10-Q) at 30; Ex. 4 (7/24/25 10-Q) at 30.  For example, Integer disclosed:

- That "forecasting future performance" is "difficult" due to its customers' independent business decisions—including "timing" of their orders, their "inventory management" plans, or "alternate supply arrangements"—which may not be "shared with" Integer and could "significantly impact [Integer's] sales."  Ex. 1 (2/20/25 10-K) at 6, 23.

- That "[r]eductions in demand" from its customers have "negatively impacted" Integer in "prior fiscal years and may impact [its] future results of operations."  *Id.* at 16.

- That its supply agreements with customers are not a "guaranteed source of revenue," including because many lack "minimum purchase level requirements," and customers "may not agree to renew or extend" those agreements.  *Id.* at 6.

- That if Integer were to "lose any of [its top three customers]," or they were to "reduce their business," Integer "would lose a substantial portion of [its] revenues."  *Id.* at 16.

Integer explained that "when [its] customers are adversely affected by these" and other factors, Integer has "in the past been and may in the future be similarly adversely affected."  *Id.*

The Individual Defendants similarly cautioned investors that Integer's growth in emerging areas like EP depended on factors outside of Integer's control, including customers' non-linear

4

ordering habits. *See, e.g.*, Ex. 5 (7/25/24 EC) at 7 ("I wish our customers' manufacturing plans were perfectly linear, but they're not."). Moreover, Integer made clear that its "future results" may be affected by "interruptions in [its] manufacturing operations," and reputational or competitive harm "caused by quality problems related to [its] products." Ex. 1 (2/20/25 10-K) at 15.

### C.    Integer's Relevant Period Performance

Each quarter during the Relevant Period, Integer disclosed company-wide sales growth of between 7% and 11%, in line with its guidance. *See, e.g.*, Ex. 5 (7/25/24 EC) at 4 (9%); Ex. 6 (2/20/25 EC) at 4 (11%); Ex. 7 (4/24/25 EC) at 5 (7%); Ex. 8 (7/24/25 EC) at 4 (11%). Integer also reported year-over-year C&V sales increases between 11% and 24% in each quarter from Q2 2024 through Q2 2025. Ex. 9 (7/25/24 8-K) (11%); Ex. 10 (10/24/24 8-K) (13%); AC ¶ 128 (15%), ¶ 138 (17%); ¶ 148 (24%). As to its EP business, Integer reported that its trailing four-quarter growth was "1.5x the market growth rate." *See, e.g.*, AC ¶¶ 109, 125, 130, 148-49, 151.

On each earnings call, Integer also disclosed to investors the approximate dollar value of its "order book" for its portfolio, *id.* ¶¶ 48, 114, which aided in estimating demand for the next one or two quarters, *see, e.g.*, Ex. 8 (7/24/25 EC) at 17 (stating that the "vast majority" of the order book is "related to the next two quarters"); Ex. 7 (4/24/25 EC) at 6, 11 (estimating backlog of $800M and annual sales of $1.9B, implying a backlog of 1.5 quarters). However, Integer cautioned investors at the start of the Relevant Period that its order book amount was "higher" than usual, and it "expect[ed] [it] to come down." Ex. 5 (7/25/24 EC) at 10.

In the context of these results, Defendants expressed optimism about "momentum," "opportunity," and "tailwinds" in the EP field. Ex. 7 (4/24/25 EC) at 9; Ex. 8 (7/24/25 EC) at 12, 15. Defendants cited the emergence of PFA technologies as one reason for their optimism, *id.* at 15, but they also explained that "what is really driving [] growth" is that "there are a lot of other products that we manufacture" for the full PFA procedure, *id.*; *see also* Ex. 5 (7/25/24 EC) at 9

("It's not only the [ablation therapy]. . . . It's the full procedure that we're able to participate in.").

Throughout the Relevant Period, Integer also provided forward-looking projections of its *current-year* performance. *See, e.g.*, AC ¶¶ 110, 125, 135, 144, 149. Integer consistently identified such statements as forward looking and directed investors to detailed cautionary statements in its SEC filings. *See, e.g.*, Ex. 5 (7/25/24 EC) at 4; Ex. 11 (10/24/24 EC) at 4; Ex. 6 (2/20/25 EC) at 4; *see supra* at 4-5. Integer did not promise that its past successes would continue or that it would meet its projections. Rather, Integer continued to disclose obstacles to its future performance and cautioned that its projections were not guarantees. *See, e.g.*, Ex. 3 (7/25/24 10-Q) at 30-31; Ex. 11 (10/24/24 EC) at 4; Ex. 1 (2/20/25 10-K) at 16-29, 35; Ex. 7 (4/24/25 EC) at 4; Ex. 4 (7/24/25 10-Q) at 34-35. Until October 2025, Integer did *not* provide guidance for 2026 or any future year.

### D.    October 2025 Disclosure of New Guidance for 2026

In an October 23, 2025 investor call, Integer reported its Q3 financial results for 2025 and provided an update on its outlook for the rest of 2025. AC ¶ 58. Integer announced that its Q3 sales had grown by 8%, consistent with its forecast. *See* Ex. 2 (10/23/25 EC) at 5; Ex. 8 (7/24/25 EC) at 13 (estimating "8%-ish" growth for Q3). Integer also disclosed that its 2025 sales expectations for C&V remained unchanged, but that it was reducing the midpoint of its 2025 overall sales forecast due to underperformance in its "CRM&N product line." Ex. 2 (10/23/25 EC) at 5-6. Nonetheless, the midpoint of Integer's guidance was still expected to be within the range of its prior forecast for 2025. *Id.*

On the same call, Integer also chose, voluntarily and preemptively, to provide preliminary guidance for 2026 for the first time. It was doing so "earlier than usual"; historically Integer did not issue forecasts until February. *See, e.g., id.* at 5, 7. Integer said that—based on information it learned from customers "during the course of the third quarter"—it expected 2026 sales would be lower relative to prior periods, *id.* at 5, 7, but that it "fully expect[ed] to get back to growth in the

second half of '26 and above market growth in 2027," *id.* at 18.

Integer noted that C&V sales—which were on target through 2025—were projected to be lower in 2026, AC ¶¶ 58, 60—a "purely 2026 impact," Ex. 2 (10/23/25 EC) at 18.  Defendant Khales[3] further explained that Integer's sales guidance for 2026 was caused by slower-than-forecasted market adoption of *three* products across *two* different sectors of the company (EP and CRM&N).  AC ¶¶ 58, 61; Ex. 2 (10/23/25 EC) at 5, 7.  Khales confirmed that the two EP products "are still on the market and expected to be in the market in 2026," Integer was "the supplier for these products," "[i]n terms of the supply, nothing has changed," and the lower guidance "just has to do with the rate of adoption of the products that our customers are seeing."  Ex. 2 (10/23/25 EC) at 17.  Khales confirmed that Integer's backlog "remained steady" at "around $730 million," providing "good visibility" for "at least 1.5 quarters."  *Id.* at 9-10, 16.

### E.     The AC's Allegations

Plaintiff brings this putative class action under Sections 10(b) and 20(a) of the Exchange Act.  Plaintiff does not challenge the accuracy of Integer's financial results or projections.  Nor does Plaintiff allege that any of the Individual Defendants' statements to investors were inconsistent with Integer's reported results.  Instead, Plaintiff contends that generalized, optimistic statements by Defendants about Integer's growth prospects in the EP and PFA areas were allegedly fraudulent.  *See* AC ¶¶ 41-60.  Plaintiff also claims that Integer's statements about "visibility" into demand and the diversification of its product portfolio were false or misleading.  *Id.* ¶¶ 35-36, 110, 114, 119-21, 137.  Plaintiff contends that these statements were misleading because Integer's growth prospects were allegedly "heavily dependent" on Medtronic's PulseSelect device—a single

---

[3] Khales was Integer's COO through October 24, 2025, when he was promoted to CEO.  Defendant Smith is Integer's CFO, and Defendant Dziedzic was Integer's CEO until October 24, 2025.  AC ¶¶ 19-22.

PFA product within the EP area of its broader C&V business—and because Integer allegedly experienced manufacturing issues in late 2024 and 2025 relating to that product in Juarez, Mexico. AC ¶¶ 7-8. Plaintiff claims that these manufacturing issues were inconsistent with some of Integer's generalized statements with which Plaintiff takes issue. *Id.* ¶ 84.

Plaintiff relies heavily on claims from two anonymous former Integer employees. FE 1— a non-executive operations staffer—and FE 2—a non-executive sourcing employee who worked for Integer for less than two years—both allegedly observed discrete manufacturing issues at Integer's Juarez plant. *Id.* ¶¶ 72, 85. Neither, however, had any role in Integer's company-wide financial reporting or its communications with investors. *Id.* The AC offers no reporting line— direct or indirect—from either FE to any Individual Defendant, and it alleges no meaningful contact with any of them. *See id.* ¶¶ 72, 85, 102-107.

The FEs' claims are also inconsistent with the AC and the documents it incorporates by reference. For instance, the FEs falsely suggest that Integer, as the "sole supplier" of Medtronic's PulseSelect (*id.* ¶ 77), "ceased produc[tion]" of PulseSelect in *July 2025* (*id.* ¶ 85). Yet, the AC itself acknowledges that Medtronic *currently* "lists PulseSelect among its PFA products." *Id.* ¶ 81 n.5. Further, Plaintiff does not dispute that Integer confirmed on the October 23, 2025 earnings call that it continued to supply all three affected products, which were "still in the marketplace." Ex. 2 (10/23/25 EC) at 9, 17. FE 1 also claims Integer only began making PulseSelect in September 2024, AC ¶ 76, and Medtronic "told Integer . . . they were going to reduce demand" in late 2024, *id.* ¶ 77. But Plaintiff incorporates by reference a transcript from Medtronic's November 2024 earnings call that confirms that: (1) Integer had been manufacturing PulseSelect since at least April 2024, and (2) Medtronic was asking Integer to increase production in November 2024 to meet demand. Ex. 12 (11/19/24 Medtronic EC) at 5, 12.

8

Finally, Dziedzic publicly announced his retirement approximately six months before the end of the Relevant Period, explaining that he wanted to spend more time with his family and friends. *See* AC ¶ 51; Ex. 7 (4/24/25 EC) at 4. Shortly after this announcement, he sold the majority of his Integer stock on May 1, 2025. AC ¶¶ 51-52, 57. The AC does not allege that the other Individual Defendants sold stock during the Relevant Period.

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiff must, *inter alia*, plead: (i) a material misrepresentation or omission; (ii) a strong inference of scienter; and (iii) loss causation. *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 41-42 (2d Cir. 2025). Under the PSLRA and Federal Rule of Civil Procedure 9(b), Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" (and, if an omission, "explain why there was a duty to disclose"). *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 440, 450 (S.D.N.Y. 2019) (Rakoff, J.). To plead scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant" acted with "an intent to deceive, manipulate or defraud," and this inference "must be cogent and at least as compelling as any opposing inference." *Shanda*, 128 F.4th at 51. Finally, loss causation requires Plaintiff to plead that the alleged misrepresentations proximately caused its losses. *Id.* at 58.

## I.    PLAINTIFF FAILS TO PLEAD A FALSE OR MISLEADING STATEMENT

### A.    Statements About Integer's Past Performance Were Not False or Misleading

Plaintiff's allegations related to Integer's historical and then-current performance, including in the C&V product line and EP sub-product line,[4] are not actionable as a matter of law

---

[4] *See* AC ¶ 109 ("[I]f you look at our past 4 quarters, our electrophysiology business . . . [is] growing at 1.5x the market"); *id.* ¶ 128 ("[C&V] sales increased 15%" in Q4 2025," "driven

because "[a]ccurate statements about past performance are self-evidently not actionable." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017).

Plaintiff asserts that these statements were misleading because they are "uniformly positive" and "touted" the Company's growth. *See, e.g.*, AC ¶¶ 2, 138-139. But Plaintiff does not plead with particularity "why and how" such statements, *the numerical accuracy of which it does not dispute*, would have misled investors. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (plaintiff "must do more than say that [challenged statements] were false and misleading").

Plaintiff appears to contend that Integer's accurate statements were misleading because Integer eventually disclosed that it was less optimistic about its *future* sales expectations for 2026. *Id.* ¶ 170. But "[d]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006). Nor must a company reporting accurate financial results speculate about whether future results might be different. *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004).

### B.    Statements About Integer's Future Growth Prospects Were Not False or Misleading

Plaintiff also challenges a series of statements about Integer's expected future performance, particularly statements describing the EP or PFA space as providing "tailwinds," "good momentum," or "opportunit[ies]" for growth. *See* AC ¶¶ 110-11, 114, 116, 118-21, 125, 130, 135, 139, 141-42, 144-45, 148-49. But these statements are inactionable for several reasons.

*First*, many are quintessential forward-looking statements, accompanied by meaningful

---

by . . . electrophysiology" and other factors.); *see also id.* ¶¶ 111, 116, 120, 125, 127-130, 135, 137-39, 141, 148-49 (similar).

cautionary language and protected by the PSLRA's safe harbor.  15 U.S.C. § 78u-5(i)(1) (protecting "projection of revenues . . . or other financial items," "plans and objectives . . . for future operations," and "future economic performance").  Integer's statements that "we absolutely expect PFA as a therapy to be [a] tailwind" (AC ¶ 110), and "we expect [our outperformance] to continue for the foreseeable future" (¶ 116) are self-evidently "projection[s] of revenues" and "future economic performance."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010) (statement is "forward-looking" when "it projects results in the future," especially when accompanied by "linguistic cues like 'we expect' or 'we believe'").

During the Relevant Period, Integer directly identified its forward-looking statements and matched them with "meaningful cautionary" language, including that its "actual results" could "differ materially" from those stated or implied by its "forward-looking statements."  *See, e.g.*, Ex. 7 (4/24/25 EC) at 4.  Integer also repeatedly directed investors to "the company's SEC filings for a discussion of the risk factors that could cause our actual results to differ materially."  *Id.*  These risk disclosures, in turn, warned investors that variability in its customer demand and ordering behavior makes "forecasting future performance difficult," and that material reductions in demand may impact "future results of operations."  Ex. 1 (2/20/25 10-K) at 16, 23; *supra* at 4.  The Individual Defendants further cautioned investors that Integer's business—including its customers' ordering habits—were "not linear" and subject to change.  *See supra* at 4-5; *Long v. Stellantis N.V.*, 2026 WL 710406, at *7 (S.D.N.Y. Mar. 13, 2026) (statement protected by PSLRA safe harbor where it was "couched with the clarification" that growth and inventory "may not be linear every quarter").  In light of these disclosures, the PSLRA's safe harbor squarely applies. *See Smith v. Purecycle Techs.*, 2024 WL 5186586, at *9-10 (S.D.N.Y. Dec. 20, 2024).

*Second*, many of the challenged statements (*see, e.g.*, AC ¶¶ 114, 116) are independently

11

inactionable as puffery because they are unquantifiable, subjective statements that "are too general for a reasonable investor to have relied on them." *In re Adient PLC Sec. Litig.*, 2020 WL 1644018, at \*22 (S.D.N.Y. Apr. 2, 2020). This includes statements describing the EP and PFA spaces as "tailwinds" (AC ¶¶ 110, 118, 121, 125, 135, 142, 144-45, 149, 151); touting Integer's "good momentum" (*id.* ¶¶ 144-45, 149); describing the potential for "strong growth" (*id.* ¶¶ 128-30); and stating that Integer is "well-positioned" to support its customers (*id.* ¶¶ 121, 135). These optimistic statements are not actionable because they are subjective and unquantified, and not measurable by any objective standard. *See In re Adobe Inc. Sec. Litig.*, 2025 WL 936416, at \*10 (S.D.N.Y. Mar. 27, 2025) (statements about "tailwinds" were "plainly puffery"); *Robeco Cap. Growth Funds v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (statements regarding "tailwind[s]" and "continued momentum" were "textbook cases of corporate optimism"); *Hawes v. Argo Blockchain PLC*, 2024 WL 4451967, at \*3 (S.D.N.Y. Oct. 9, 2024) (statements "that a company is 'well positioned'" are "puffery, and hence non-actionable").

*Third*, several of the challenged statements are inactionable opinions, marked by "tell-tale sign[s]" of opinion language, such as we think or "we believe." *Shapiro v. TG Theraps. Inc.*, 652 F. Supp. 3d 416, 424 (S.D.N.Y. 2023) (Rakoff, J.); *see, e.g.*, AC ¶ 114 ("I think our customers remain very, very optimistic . . ."); ¶ 121 ("[W]e think we're incredibly well positioned to support the industry . . ."); *see also id.* ¶¶ 120, 133, 135, 144, 149. Because Plaintiff fails to plead that these opinions were not honestly held, *see infra* Section II, or reflect embedded false statements of fact, the opinions are not actionable. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194 (2015).

*Finally*, the documents incorporated by reference in the AC confirm that EP was indeed a "tailwind" for Integer. The quarterly results Integer reported to investors, which Plaintiff does not

12

challenge, showed double-digit, year-over-year increases in C&V sales. *See supra* at 5. They provided direct numerical support for Defendants' statements.[5] To the extent that Plaintiff alleges that demand did not materialize as predicted, that is simply hindsight pleading that does not render earlier statements false when made. *See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 269 (S.D.N.Y. 2009) ("[M]anagement's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct.").

**C.    Statements About Integer's Visibility into Customer Demand and Diversification of Its Product Portfolio Were Not False or Misleading**

Plaintiff also seeks to plead two other categories of alleged misstatements: (1) statements about "visibility" into customer demand, *see* AC ¶¶ 110, 114, 119, 121, 137, 148, and (2) statements about the extent to which Integer was not reliant on a single product or customer, *see id.* ¶¶ 110, 120, 133. These allegations fail for the same reasons, including because the AC does not plead any facts to support that the statements were false when made.

**1.    "Visibility" into Demand**

Throughout the Relevant Period, Integer disclosed the estimated amount of its order book, which provided information about then-current customer orders. *See supra* at 5. The AC does not assert that any of these order book numbers were false or that they did not provide "visibility" into demand. Nor could it: having hundreds of millions of dollars in contracted orders objectively provides visibility into demand. Plaintiff likewise does not allege that customers had reduced or withdrawn orders *at the time of* the challenged statements. Instead, Plaintiff points to *later* developments—namely, the alleged decline of Medtronic's demand in 2025, *see* AC ¶ 112—to

---

[5] Plaintiff does not allege that Integer's 2025 results missed the guidance it conveyed to investors at the start of the year. Nor could it: Integer *met* its forecasted projections for full-year 2025, including growing total sales by 8% and C&V sales by 16.6%. Ex. 13 (2/23/26 10-K) at 38.

support its claims.  But later changes in demand are not enough to plead that an earlier statement about visibility into demand was false when made.  *See Sterling*, 655 F. Supp. 2d at 269.[6]

Moreover, Defendants' statements about visibility into demand must be viewed in full context, as Defendants repeatedly warned investors that Integer's business depended on customer demand, that ordering patterns were "not linear," and that short-term performance could fluctuate based on external factors.  *See supra* at 4-5; *Golesorkhi v. Green Mt. Coffee Roasters, Inc.*, 973 F. Supp. 2d 541, 556 (D. Vt. 2013) (dismissing claims premised on optimistic predictions regarding demand that did not materialize where defendants "disclosed that there were challenges to estimating sales"), *aff'd*, 569 F. App'x 43 (2d Cir. 2014).  In short, Plaintiff alleges that demand later softened and that Integer subsequently updated its guidance accordingly.  But the "[f]ailure to accurately predict future business developments" does not constitute securities fraud, *Klein v. Goetzmann*, 745 F. Supp. 107, 111 (N.D.N.Y. 1990), and "defendants' lack of clairvoyance simply does not" give rise to liability, *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).

### 2. Diversification of Product Portfolio

Plaintiff also challenges three statements made in July and October 2024, and March 2025 in which Defendants expressed that "no single program" was a "meaningful driver of the entire company."  AC ¶ 133; *see id.* ¶¶ 110, 120.  Plaintiff theorizes—without support—that this statement was false when made because Integer was overly reliant on Medtronic's PulseSelect device, and when its demand slowed, it "materially change[d] the Company's outlook."  *Id.* ¶ 134.

---

[6] For the reasons set forth above, Defendants' statements about their "visibility" into demand (AC ¶ 110) are also puffery.  *See, e.g.*, *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *13 (S.D.N.Y. Mar. 15, 2022) (statement that company "had the biggest pipeline we've had" was not actionable); *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *6 (N.D. Cal. Mar. 2, 2012) (statement that "management had 'exceptional visibility' into Equinix's financial model" was "too vague to be actionable or support an inference that Defendants had 'actual knowledge' that Equinix could not achieve its revenue forecasts").

These allegations fail for a number of reasons.

Plaintiff does not plead facts that support its conclusory assertion that these statements are false. Indeed, multiple other disclosures—that Plaintiff does not challenge—reflect Integer's diversification across multiple therapy areas, products, and supply chains. *See, e.g.*, Ex. 1 (2/20/25 10-K) at 4-6. Plaintiff claims that the *later* demand declines that led to the October 2025 disclosure somehow proved that Integer was reliant on a single product. But that is doubly wrong. As a matter of law, "hindsight-driven" pleading like that is "insufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA." *Finger v. Pearson PLC*, 2019 WL 10632904, at *14 (S.D.N.Y. Sept. 16, 2019) (Sullivan, J.). And in any case, Plaintiff's allegations contradict its theory. The AC concedes that Integer's guidance projecting reduced sales growth in 2026 was based on expectations that "sales of *three* new products"—including a non-EP product—were expected to decline. AC ¶ 73. Even if hindsight pleading were sufficient, hindsight here would prove only that it took declines in *three* products, not *one*, to drive this outcome. *See id.* ¶ 134.

Moreover, when read in context, these statements were neither false nor misleading. A statement cannot be misleading where the company "expressly warned of and included disclosures that directly related to the risk that brought about plaintiffs' alleged loss." *City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, 2024 WL 4349289, at *6 (S.D.N.Y. Sept. 30, 2024). Here, Integer repeatedly disclosed its reliance on a small number of key customers and that changes in their ordering patterns could materially affect its results. *See supra* at 4-5. In other words, these disclosures addressed the very risk Plaintiff claims materialized. *See* AC ¶ 134.

### D.    None of the Challenged Statements Were Misleading by Omission

Plaintiff also fails to plead any actionable omission. As an initial matter, the AC only offers boilerplate assertions that Defendants did not "disclose material adverse information regarding Integer's business and operations." AC ¶ 176. The only specific omission Plaintiff identifies is

15

Integer's alleged failure to disclose manufacturing issues relating to the PulseSelect device at Integer's Juarez facility. *See, e.g.*, *id.* ¶¶ 122-23. But "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *Gru v. Axsome Ther., Inc.*, 2023 WL 6214581, at *6 (S.D.N.Y. Sept. 23, 2023) (dismissing complaint for failure to allege omission related to manufacturing problems). Rather, in the absence of an affirmative legal obligation to disclose—which Plaintiff does not allege—a duty to disclose arises only "when disclosure is necessary to make prior statements not misleading." *Time Warner*, 9 F.3d at 268.

Here, Plaintiff fails to identify any statement rendered misleading by the alleged omission. Plaintiff does not allege that Defendants said anything about the absence of manufacturing issues, much less one that would require disclosure of discrete operational challenges. Nothing in Defendants' statements "suggested that the subsequently-identified [alleged] deficiencies *did not exist*." *Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 254 (S.D.N.Y. 2023) (Rakoff, J.) (emphasis in original). To the contrary, Integer warned investors that "interruptions in our manufacturing operations" could "cause actual results to differ from the results expressed or implied by our forward-looking statements."[7] *See id.* (omissions were not misleading when considered "as a whole" in context of disclosures). Moreover, Plaintiff fails to plead that alleged issues at the Juarez plant caused Integer's actual results to differ. Even though Plaintiff alleges that Integer ceased production of PulseSelect at the Juarez facility in July 2025 (AC ¶ 85)—allegations directly contradicted by the AC and the documents incorporated therein, *supra* at 8—Plaintiff does not dispute that Integer's sales *did* meet expectations for that quarter and that Integer's C&V

---

[7] This disclosure was included in every 10-K, 10-Q, and earnings press release that Integer issued. *See, e.g.*, Ex. 1 (2/20/25 10-K) at 16; Ex. 14 (10/24/24 10-Q) at 30; Ex. 15 (4/24/25 8-K).

16

projections for the rest of 2025 remained unchanged. *See* Ex. 2 (10/23/25 EC) at 18.

## II.   PLAINTIFF FAILS TO PLEAD THE REQUISITE STRONG INFERENCE OF SCIENTER

The AC separately fails because it does not plead "with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), which "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs v. Makor Issues & Rts.*, 551 U.S. 308, 314 (2007). Plaintiff does not plead particularized facts showing either (1) a motive to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022).

### A.   The AC Does Not Plead Any Legally Cognizable Motive Allegations

Plaintiff's sole motive allegation—one stock sale by Dziedzic one week after Integer announced his retirement and six months before October 2025 (AC ¶¶ 52, 57)—does not plead scienter for two reasons. *First*, the AC does not allege that the other Individual Defendants sold any Integer stock during the Relevant Period, which "fatally undermines the motive allegations premised on [Dziedzic's] lone sale." *Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) (similar). Indeed, Smith and Khales actually *increased* their holdings during the Relevant Period. Ex. 16 (2/25/25 Form 4 (Khales)); Ex. 17 (2/25/25 Form 4 (Smith)). Such conduct is "wholly inconsistent" with a desire to take advantage of allegedly inflated stock prices. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

*Second*, Plaintiff fails to plead that Dziedzic's stock sale is sufficiently "unusual" to plead motive. *Bristol-Myers*, 28 F.4th at 355. Plaintiff concedes that Dziedzic's sale took place one week after Integer publicly announced his retirement. AC ¶ 51. Under these circumstances, "the most plausible inference is that [he] sold his stock as a 'normal and expected' consequence of his

17

retirement, not as part of an unsubstantiated conspiracy to defraud." *City of Taylor Gen. Empls. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013); *see also In re Teladoc Health, Inc. Sec. Litig.*, 2025 WL 886934, at *11 (S.D.N.Y. Mar. 21, 2025) (similar).

Nor did Dziedzic sell his shares "shortly before the public disclosure of negative information." *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *22 (S.D.N.Y. Feb. 23, 2009). In fact, the opposite is true. Dziedzic sold his stock on May 1, 2025 nearly *six months* before the voluntary, early release of 2026 guidance, which Plaintiff alleges is a corrective disclosure.[8] Stock sales made "neither at the beginning of the Class Period, soon after the allegedly misleading statements, nor clustered at its end" are not suspicious. *Koplyay v. Cirrus Logic, Inc.*, 2013 WL 6233908, at *5 (S.D.N.Y. Dec. 2, 2013). Moreover, Plaintiff also alleges that Dziedzic made additional purported misstatements after his stock sales on May 1, 2025 and as late as July 2025, AC ¶¶ 141, 148, which preclude an inference that the sales were "calculated to maximize the personal benefit from undisclosed inside information." *Taylor*, 967 F. Supp. 2d at 800.

### B. The AC Does Not Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Because Plaintiff fails to allege motive, the strength of Plaintiff's circumstantial scienter allegations "must be correspondingly greater." *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 307 (S.D.N.Y. 2021). Plaintiff must plead "highly unreasonable" behavior and "an extreme departure from the standards of ordinary care" that "approximate[s] an actual intent." *S. Cherry St. v. Hennessee Grp.*, 573 F.3d 98, 109-10 (2d Cir. 2009). Plaintiff again falls short.

At bottom, Plaintiff infers fraud from allegations that Integer *voluntarily* previewed

---

[8] And because the alleged corrective disclosure was an unplanned announcement, the proximity to any *required* corrective disclosure was even further away. Had Integer released its 2026 guidance on schedule in February 2026, Dziedzic's sale would have preceded it by 10 months.

disappointing 2026 guidance four months earlier than usual to update the market. *See, e.g.*, AC ¶¶ 58-59. It provided that guidance even though it was still on track to meet its overall sales guidance in 2025 and was not adjusting its 2025 sales expectations for the C&V space. *See supra* at 6-7. The most compelling inference is that Integer updated investors about a decline in end market demand and the effect on future sales at the first opportunity after those developments materialized. *See id.* ¶ 61. This is evidence of responsible corporate disclosure practice, not fraud. *See In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *16 (S.D.N.Y. July 23, 2025) ("[T]he more plausible inference . . . is that [defendant] believed its turnaround strategy was proving successful . . . and promptly revised its guidance once additional information revealed otherwise."). In all events, the circumstantial evidence that Plaintiff alleges is insufficient to plead a strong inference of scienter.

### 1. The Allegations of Purported Manufacturing Difficulties at a Single Plant Do Not Plead a Strong Inference of Scienter

Plaintiff seeks to plead scienter by alleging the Individual Defendants knew of manufacturing difficulties at a single Integer facility. This theory hinges on (1) internally inconsistent allegations attributed to unnamed FEs, and (2) cherry-picked language from two earnings transcripts. Neither—individually or together—meet Plaintiff's burden on scienter.

*First*, the allegations attributed to two unnamed former Integer employees, referred to as FE 1 and FE 2,[9] regarding alleged manufacturing issues at Integer's Juarez, Mexico plant (*see* AC ¶¶ 86-98) fail to plead that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The AC does not explain how the FEs—who are only alleged to have been "directly involved in the manufacture of Medtronic's PFA" (AC ¶ 155; *see id.* ¶¶ 72, 86 n.6)—would have been in a

---

[9] Plaintiff does not allege that the remaining confidential witnesses (FEs 3-7), each of whom is alleged to be a former Medtronic employee (AC ¶¶ 100-107), support an inference of scienter.

position to know about the accuracy of Defendants' challenged statements.  As lower-level employees who worked at only one factory (of more than 20) on a single PFA product, FEs 1-2 are not alleged to have any knowledge about actual sales or projections for (1) Integer's full EP product lines, (2) its C&V portfolio, or (3) the entire Company.  As such, they did not have involvement in the sort of financial analysis, forecasting, or disclosures at a level that was actually conveyed to investors.  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 525 (S.D.N.Y. 2020) (rejecting allegations about data access when CW was not "senior member of management" and did not explain "how he would have known about the profitability of the product as a whole").[10]

Moreover, FEs 1-2 do not claim to have had any direct or meaningful contact with the Individual Defendants.  *See Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (holding allegations of sources with no alleged direct contact with defendants insufficient to plead scienter).  FEs 1-2 had no contact with Dziedzic or Smith.  FE 1 alleges a single undated discussion with Khales where she claims to have "explained" unspecified manufacturing issues to him and unnamed "other executives."  AC ¶ 90; *see In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *24–25 (S.D.N.Y. Oct. 10, 2018) (CW allegations unconnected to the misleading statements fail to "demonstrate[] with specificity how the . . . statements at issue were false or misleading").  FE 2 also alleges that Dziedzic and Khales participated in "weekly meetings" discussing revenue at manufacturing sites.  AC ¶ 97.  But FE 2 does not allege that she attended those meetings, when they occurred, what specific information was conveyed, and how it contradicted any challenged statement.  *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201,

---

[10] Plaintiff alleges only that FE 1 was involved in "color-coding" revenue streams *at the Juarez plant for Medtronic's PFA device* (AC ¶ 89), but does not allege that FE 1 had any involvement in Integer's forecasting for any other product, much less its larger business.

242 (S.D.N.Y. 2023) (participation in "weekly forecast meetings" insufficient because complaint "fail[ed] to explain how [the] information discussed during those meetings . . . contradicted Defendants' public statements"). Finally, the FEs make conclusory assertions about what issues executive leadership "would have known about" (AC ¶ 98), but allegations of "common knowledge" cannot plead scienter. *Schiro v. Cemex*, 396 F. Supp. 3d 283, 305-06 (S.D.N.Y. 2019).

In any case, even if the Individual Defendants knew about the issues at the Juarez plant, Plaintiff does not plead how this information contradicted the challenged statements, which never represented or suggested that manufacturing issues did not exist. *See supra* Section I.D. Rather, Integer's risk disclosures *warned* investors of these very risks associated with manufacturing. *Id.* At bottom, the allegation that Integer had purported manufacturing issues with one product at one of its over 20 facilities does not conflict with any of the challenged statements, which had nothing to do with specific products, the invulnerability of Integer's manufacturing facilities, or anything otherwise inconsistent with these FE allegations. *See Supercom*, 2018 WL 4926442, at *24-25.

*Second*, Plaintiff alleges that statements in two earnings calls—Integer in October 2025 (AC ¶¶ 58-60) and Medtronic in November 2024 (*id.* ¶ 77)—support an inference of scienter. Citing to isolated portions of these transcripts, the AC claims that the Individual Defendants knew that Integer "only started manufacturing PulseSelect" in September 2024 and that Medtronic "publicly report[ed] in November 2024 that its PulseSelect growth had been hampered by an unnamed third-party." AC ¶ 156. Plaintiff asserts that these allegations were inconsistent with Integer's public statements about its growth prospects in the EP space. *See, e.g.*, AC ¶ 136.

But the transcripts themselves undermine these allegations.[11] Although Medtronic's CEO

---

[11] "If a document integral to the complaint contradicts that complaint, the document controls, and the court need not accept the complaint's allegations as true." *Trustpilot Damages LLC v. Trustpilot, Inc.*, 2021 WL 2667029, at *3 (S.D.N.Y. June 29, 2021) (Rakoff, J.).

21

did mention in November 2024 that its "ablation business didn't accelerate" as expected "because of [a] third-party component supplier that experienced an interruption" (*id.* ¶ 77), Plaintiff omits the next part of the statement, which makes clear that these issues were "resolved" and that Medtronic was "in a good spot from a supply perspective going forward":

> That supplier is back on track.  That issue is resolved.  They've expanded their capacity as well . . . which is allowing us to ramp the PulseSelect supply and activate new accounts.  PulseSelect is doing well . . . it's in a good spot from a supply perspective going forward. Like we literally sold everything, every unit we had in Q2.

Ex. 12 (11/19/24 Medtronic EC) at 11.  In the same transcript, Medtronic's CEO also said in its second quarter, ending October 24, 2024, that it "doubled" both "physicians using PulseSelect" and the "total number of patients treated with [PulseSelect] in Q2."  *Id.* at 3, 11.  In other words, Medtronic's own growth projections for PulseSelect were fully consistent with Integer's communications to investors that it expected "tailwinds" and "momentum" from the EP space.

Moreover, contrary to the FEs' allegations that Integer "ceased" producing PulseSelect in July 2025 (AC ¶ 85), Khales told investors on Integer's October 2025 earnings call that all three affected products continue to be supplied by Integer, and "are still on the market and expected to be in the market in 2026."  Ex. 2 (10/23/25 EC) at 17.  He explained that "[i]n terms of the supply, nothing has changed.  It just has to do with the rate of adoption of the products that our customers are seeing."  *Id.*  Plaintiff does not challenge this explanation, and indeed, concedes that Medtronic "still lists PulseSelect among its PFA products."  AC ¶ 82 n.5.[12]

Read in their entirety, these transcripts undermine Plaintiff's allegations that

---

[12] Moreover, Plaintiff does not allege that Medtronic ever disclosed that its expectations for PulseSelect *in 2025* were impacted by manufacturing issues at Integer.  Nor could it.  In November 2025—four months after Plaintiff claims that Integer shut down manufacturing and a month after the alleged corrective disclosure—Medtronic told its investors that it had "experienced strong growth in PulseSelect" over the prior two quarters.  *See* Ex. 18 (Medtronic 11/25/25 10-Q) at 39.

manufacturing issues at Integer were a barrier to PulseSelect's growth or that Medtronic was not expecting to grow this business in 2025. AC ¶¶ 80, 85. The statements also confirm that the allegation that Integer was delayed in manufacturing PulseSelect until September 2024 is false; Medtronic confirmed that it had been selling PulseSelect since at least April 2024 and was actively increasing its growth. Because Plaintiff alleges that Integer was PulseSelect's "sole supplier" (*id.* ¶ 77), the growth that Medtronic disclosed was necessarily driven by Integer's production.

### 2.    Plaintiff's Remaining Circumstantial Allegations Fail

Plaintiff's invocation of the "core operations" doctrine based on the purported importance of EP and PFA (AC ¶¶ 153-54) to Integer is insufficient to raise a strong inference of scienter. It is well established that the core operations doctrine "cannot establish scienter independently." *Wilbush*, 271 F. Supp. 3d at 500. And even if it could, it would be inapplicable here because Plaintiff fails to allege that PFA "constitute[s] nearly all of [Integer's] business." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). Plaintiff concedes that Integer's C&V product line accounted for roughly 60% of its revenues. AC ¶ 28.

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Plaintiff's claims independently fail because the AC does not sufficiently plead loss causation—i.e., "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). At a minimum, this requires "a plausible causal link between [its] loss and [Integer's] alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). Here, "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue." *In re Miniso Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *19 (S.D.N.Y. Feb. 23, 2024).

*First*, Plaintiff has not pled that the alleged "corrective disclosure" in October 2025

23

revealed any "then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). Plaintiff does not allege that Integer corrected any prior statements or revised any previously issued reports on that earnings call. This precludes Plaintiff from alleging that Integer's statements about its past results or growth prospects were corrected in October 2025. *See Alaska Laborers Emps. Ret. Fund v. Scholastic Corp.*, 2011 WL 3427208, at *3 (S.D.N.Y. Aug. 3, 2011) (disclosure of poor earnings did not "reveal the falsity of earlier statements made by Defendants" about past performance).

Instead, Plaintiff alleges that the cause of the stock price decline was the announcement of "disappointing financial guidance" *for 2026* based on slower market adoption of several products. AC ¶ 170. But any nexus between Integer's forward-looking disclosures estimating future sales with "purely a 2026 impact," Ex. 2 (10/23/25 EC) at 18, and the statements many months earlier is "far too tenuous" to support loss causation, *Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337-39 (S.D.N.Y. 2012).

Plaintiff claims that the October 2025 statement corrected Integer's prior statements about visibility into demand, AC ¶¶ 61, 63, but Plaintiff never alleged that Integer said it had visibility into *2026* demand. Rather, between July 2024 and July 2025 (reporting for Q2 2025), Plaintiff alleges that Integer advised its investors that it had "visibility" into demand for one to two quarters—i.e., at most six months—based on its order book. *See, e.g.*, AC ¶ 35; *see also supra* at 5. As a matter of pure chronology, none of the alleged misleading statements (the last of which was made on July 24, 2025) could have materially addressed demand in 2026.[13] Moreover, on the very same October 2025 call, Integer actually reiterated—not corrected—that Integer's backlog

---

[13] Plaintiff alleges one misrepresentation during a September 4, 2025 Wells Fargo healthcare conference, but that statement did not touch on forward-looking demand. AC ¶¶ 56, 151.

"remained steady" at "around $730 million," providing Integer with "good visibility" for "at least 1.5 quarters." Ex. 2 (10/23/25 EC) at 9-10, 16. This does not plead loss causation. *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) ("It is the *exposure of the falsity* of the fraudulent representation that is the critical component of loss causation.").

In addition, Plaintiff cannot allege that the October 2025 statement corrected prior statements regarding the diversification of Integer's product portfolio. As already discussed, the announcement of disappointing expectations for 2026 on the basis of the underperformance of *three products in two different sectors* did not and could not "reveal to the market the falsity of [a] prior statement," *Lentell*, 396 F.3d at 175 n.4, about the Company's performance not being tethered to "*one part of [the] business or one program*," AC ¶ 110; *see supra* Part I.C.2.

*Second*, Plaintiff has not pled the materialization of any undisclosed risk—indeed, the Complaint does not even attempt to do so. AC ¶¶ 55-69, 168-173. Nor could it, as Plaintiff would need to plead that Integer "*concealed* the risk" that market end demand or reduced orders from large customers could reduce its revenues and performance. *Lentell*, 396 F.3d at 177. Yet, as noted above, Integer expressly warned investors of these exact risks. *See, e.g.*, Ex. 1 (2/20/25 10-K) at 16. Even if Plaintiff had tried to plead a materialization of an undisclosed risk, Integer's risk disclosures would preclude this theory. *See Omaha*, 2024 WL 4349289, at *9 (no loss causation where defendant "expressly disclosed" the risks that later materialized).

## IV.    PLAINTIFF'S CONTROL PERSON CLAIM FAILS

Plaintiff's control person claim fails because the AC does not plead a primary violation of the Exchange Act. *See Shapiro*, 652 F. Supp. 3d at 426.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's AC with prejudice.

25

Dated: May 1, 2026
New York, New York

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

*/s/ Edmund Polubinski*
Edmund Polubinski

Edmund Polubinski
Patrick Blakemore
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Email:  edmund.polubinski@davispolk.com
        patrick.blakemore@davispolk.com

*Attorneys for Defendants Integer Holdings Corporation, Joseph W. Dziedzic, Diron Smith, and Payman Khales*

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Edmund Polubinski*
Edmund Polubinski

**WORD COUNT CERTIFICATION**

I, Edmund Polubinski, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c), and with the 25-page limit and formatting requirements set forth in Rule 2(e) of this Court's Individual Rules of Practice. According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 7,899 words in the document.

*/s/ Edmund Polubinski*
Edmund Polubinski