UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEMBROKE PINES PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>-v-<br><br>INTEGER HOLDINGS CORP., et al.,<br><br>Defendants. | 25-cv-10251 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

Plaintiff's first amended class action complaint ("FAC") brought two claims against various defendants for violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") arising from public statements made by executives of Integer Holdings Corporation ("Integer") between July 25, 2024 and September 4, 2025. Defendants moved to dismiss, see ECF No. 42, and the Court granted the motion by bottom-line order on June 22, 2026, see ECF No. 47. This Opinion and Order explains the reasons for granting the motion to dismiss and directs the entry of final judgment.

## I. Background

### A. Factual Background

Integer is a contract medical device manufacturer that builds medical devices and components for major medtech companies, including Medtronic, Abbott, and Boston Scientific, Integer's three largest customers. FAC ¶¶ 1, 31. Until October 24, 2025, defendant Joseph

Dziedzic ("Dziedzic") was its CEO, President, and Director, defendant Payman Khales was its COO, id. ¶¶ 20, 22, 51, and defendant Diron Smith was its CFO and Executive Vice President (collectively, and together with other Integer executives named as defendants, the "Individual Defendants"), id. ¶ 22.

Throughout the Class Period, beginning on July 25, 2024 and ending on October 22, 2025, Integer's largest and most important manufacturing segment was its Cardio & Vascular ("C&V") product line. Id. ¶ 28. Within its C&V segment, Integer's most promising growth area was electrophysiology ("EP") -- a category of devices used for the diagnosis and treatment of heart arrythmias -- and, in particular, a new type of EP technology known as pulsed field ablation ("PFA"). Id. ¶¶ 1, 28. Integer had been building its presence in the EP market for many years, but its entry into PFA products accelerated in 2024 as the technology achieved regulatory approvals and moved towards broader commercialization. Id. ¶ 34. Medtronic's PulseSelect was the second PSA device to obtain regulatory approval in the United States, in December 2023, and "was launched in the first half of 2024." Id. ¶ 37. According to the FAC, "Medtronic looked to Integer to provide large volumes of the product to satisfy end-user demand." Id. The FAC alleges that "Integer was the sole manufacturer" of PulseSelect, and that Integer manufactured PulseSelect "exclusively at the Company's Juarez, Mexico facility." FAC ¶ 7.

In early 2024, Integer's leadership began publicly touting PFA as a "targeted growth market", emphasizing that the company was seeing

"'very strong' growth in its EP business driven by [] customers' ramp and launch programs for PFA-related devices." Id. ¶ 34. At the same time, Integer's leadership assured investors that the company had "great visibility" into customer demand for its products and emphasized that Integer was not solely dependent on any "one part of [its] business" for its growth. Id. ¶¶ 35, 42.

In 2025 the PFA market became increasingly competitive. Id. ¶ 47. At the same time, according to two former employees that worked at Integer's Juarez plant, Integer was allegedly experiencing manufacturing problems with the production of Medtronic's PulseSelect device. FAC ¶¶ 74-76, 79. By December 2024, Medtronic had allegedly returned over 1,000 PulseSelect units due to claimed defects, had placed no orders for 2025, and had blamed PulseSelect's underperformance on a "third-party component supplier interruption." Id. ¶¶ 80-82, 90, 117.[1] By April or May 2025, Medtronic had allegedly

[1] The FAC's allegations are inconsistent with Medtronic's full statements, which the FAC does not quote or acknowledge: Medtronic's CEO stated that "our overall CAS growth did not accelerate as expected this quarter due to a third-party component supplier interruption. **They've now expanded capacity allowing us to continue to ramp PulseSelect availability and activate new accounts.**" Medtronic Nov. 19, 2024 Earnings Call Transcript at 3, ECF No. 44-12 (emphasis added). Medtronic's CEO repeated the same statement later on the same call: "our ablation business didn't accelerate as we expected this quarter because of this third-party component supplier that experienced an interruption in their supply to us. **That supplier is back on track. That issue is resolved.** They've expanded their capacity as well and which is allowing us to ramp the PulseSelect supply and activate new accounts. PulseSelect is doing well." Id. at 11 (emphasis added). "If a document integral to the complaint contradicts that complaint, the document controls, and the court need not accept the complaint's allegations as true." Trustpilot Damages LLC v. Trustpilot, Inc., No. 21-CV-432, 2021 WL

returned all of the initial 5,000 PulseSelect units. Id. ¶ 83. And, in June 2025, Integer shut down production of Medtronic's PulseSelect device at its Juarez plant and laid off all employees responsible for the PulseSelect production line. Id. ¶ 84.

Throughout this period, Integer's leadership continued to assure investors that its EP and PFA device manufacturing provided a "tailwind" for the business. Id. ¶ 48. Integer, however, made no specific claims about the PulseSelect product or the Juarez plant.

On April 24, 2025, Integer announced that Dziedzic would retire as president and CEO effective October 24, 2025. Id. ¶ 51. One week later, on May 1, 2025, Dziedzic sold 88 percent of his Integer shares, generating roughly $38.6 million in profits. Id. ¶ 52. This was the first time Dziedzic had sold any of his Integer stock during his eight-year tenure as CEO. Id. ¶ 53. Plaintiff alleges that Dziedzic knew at this point that Integer's EP business was in "free fall." Id. ¶ 54.

In the months that followed Dziedzic's one-day stock sale, Dziedzic and Integer's leadership continued to tout the company's PFA business as a growth engine. For example, Integer stated it was "outperforming the market" in EP and described PFA as "driving a lot of growth" and "giving us some tailwinds" on July 24, 2025. Id. ¶ 55.

---

2667029, at *3 (S.D.N.Y. June 29, 2021), aff'd, No. 21-2837, 2022 WL 2124865 (2d Cir. June 13, 2022); see also infra n.2 and Koplyay v. Cirrus Logic, Inc., No. 13-cv-790, 2013 WL 6233908, at *4 (S.D.N.Y. Dec. 2, 2013) ("[B]ecause the Complaint quotes and relies upon statements made in press releases and investor calls, the Court may properly consider the complete referenced press releases, the full transcripts of those calls.");.

As late as September 4, 2025, Integer's leadership was continuing to tell investors that PFA was a "tailwind" for the company. Id. ¶ 56.

On October 23, 2025, however, during Integer's Q3 2025 earnings call, then-COO Payman Khales revealed a less rosy picture. He announced that the company "expect[ed] sales of [three] new products to decline in 2026," two of which were EP products. Id. ¶ 58. Khales explained that Integer had "learned during the course of the third quarter" that "market adoption of [those three] products has been less than what [Integer] had anticipated." Id. ¶ 61. Integer therefore reduced its sales outlook for 2025 and projected a "3% to 4% headwind to [Integer's] total company sales for [2026]." Id. ¶ 58.

At the same time, Integer Chief Financial Officer Diron Smith reassured investors that Integer's Q3 2025 financial results were "strong." Integer Oct. 23, 2025 Earnings Call Transcript at 5, ECF No. 44-2.[2] With respect to Integer's C&V product line (which includes its EP and PFA products), Smith reported that sales had increased 18% year-over-year on a trailing four-quarter basis, and that, for the full year 2025, Integer still expected C&V sales "to grow in the mid-

[2] This and all other SEC filings, earnings releases, and earnings call transcripts which are cited herein, and which were attached to defendants' declaration in support of their motion to dismiss, see ECF No. 44, may be considered by the Court because they are integral to the FAC or because they are public SEC filings. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (on a motion to dismiss, courts may consider documents which are "integral to the complaint," and in a securities fraud case, courts may "examine" the documents that contain the allegedly fraudulent statements and other public SEC filings "to determine what the documents stated and not to prove the truth of their contents" (citation modified)).

teens . . . consistent with what we shared on our July earnings call." Id. at 6.

Plaintiff alleges that, in response to the revelations at Integer's Q3 2025 earnings call, the value of Integer's stock fell by almost one-third in a single day, from $109.11 per share to $ 73.89 per share. Id. ¶ 62.

**B. Procedural History**

On December 10, 2025, West Palm Beach Firefighters Pension Fund filed this action against Integer and its officers on behalf of a class of persons and entities that purchased Integer common stock between July 25, 2024 and October 22, 2025, alleging securities fraud under sections 10(b) and 20(a) of the Exchange Act. On March 16, 2026, the Court appointed Pembroke Pines Pension Fund as lead plaintiff and Saxena White as lead counsel. ECF No. 35. Pembroke Pines filed the FAC on April 10, 2026. ECF No. 41.

Defendants moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6) on January 18, 2026. See ECF No. 116. Briefing on the motion was completed on April 22, 2026. See ECF No. 122. The Court granted the motion to dismiss by bottom-line order on June 15, 2026. See ECF No. 125.

## II. Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court "review[s] the complaint['s] sufficiency under the notice-pleading standard, which requires [p]laintiff[] to assert enough facts to state a claim to relief that is plausible on its face." Hutchison v. Deutsche Bank, 647

F.3d 479, 484 (2d Cir. 2011) (quoting In re Lehman Bros., 650 F.3d 167, 174 (2d Cir. 2011)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true all factual allegations and draws all reasonable inferences in favor the plaintiff. Hutchinson, 657 F.3d at 483-84.

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act of 1995] and [Federal Rule of Civil Procedure 9(b)] by stating with particularity the circumstances constituting fraud." ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase, Co., 553 F.3d 187, 196 (2d Cir. 2009). Thus, "the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. (quoting 15 U.S.C. § 78u-4(b)(1), (2)).

## III. **Discussion**

Plaintiff brings two counts of securities fraud. Count One alleges that Integer and the Individual Defendants violated section 10(b) and Rule 10b-5 of the Exchange Act by making "numerous false or misleading statements." FAC ¶ 108. Count Two alleges that the Individual Defendants are liable for Integer's misconduct alleged in Count One as controlling persons under section 20(a) of the Exchange Act.

"To state a private securities-fraud claim under § 10(b) and Rule 10b-5, a plaintiff must plead (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." In re Shanda Games Ltd. Sec. Litig., 128 F.4th 26, 41-42 (2d Cir. 2025) (citation modified).

"Section 20(a) provides that individual executives, as controlling persons of a company, are secondarily liable for their company's violations of the Exchange Act. To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." In re Shanda Games Ltd. Sec. Litig., 128 F.4th at 59. Therefore, in this case, plaintiff must state a plausible claim under section 10(a) to state a plausible claim under section 20(a).

For the reasons explained below, the FAC does not adequately allege a false or misleading statement or sufficiently allege scienter under the heightened pleading standard of the PSLRA and thus fails to state plausible claims.

**A. False or Misleading Statement**

Plaintiff alleges Integer made three categories of false or misleading statements during the class period: first, positive statements about Integer's EP and PFA business; second, statements about Integer's diversification of products; and third, statements

about Integer's visibility into its customers' demand. The Court addresses each in turn.

1. Positive statements about Integer's business

Plaintiff argues that Integer "present[ed] a misleadingly positive picture by omitting known adverse facts" when defendants "tout[ed] EP growth and PFA 'tailwinds' while hiding massive manufacturing failures, mass product returns, and the loss of their most critical PFA product." Opp. at 12-13. Specifically, the statements challenged under this theory are defendants' repeated claims throughout 2024 and 2025 that the EP business "was growing at 1.5x the market growth rate" and that PFA was a "tailwind for the company for sure." Opp. at 11-13 (citing FAC ¶¶ 41, 45, 48, 120-21, 125, 138-39, 142); see FAC ¶¶ 109, 111, 116, 120, 125, 127-130, 135, 137-39, 141, 148-49 (similar). For example, Integer stated:

- "if you look at our past 4 quarters, our electrophysiology business, although we don't report the specific number, it's growing at 1.5x the market growth rate." FAC ¶ 109 (quoting July 25, 2024 Earnings Call Transcript).

- "our electrophysiology portfolio products . . . is growing at 1.5 times the market rate over the last four quarters. . . . But we're growing faster than the market our portfolio of EP products. And so, we feel like we're outperforming in that space and we expect that to continue for the foreseeable future." FAC ¶ 116 (quoting statements by Integer at the September 4, 2024 Wells Fargo Healthcare Conference).

- "Cardio & Vascular (C&V) sales increased 15% in the fourth quarter 2024 compared to fourth quarter 2023, driven by new product ramps in electrophysiology and the Pulse acquisition." "Full year sales increased 14% year-over-year, with strong growth across targeted C&V markets, driven by electrophysiology." And, "[w]e expect 8% to 10% sales growth in 2025 and adjusted operating income to grow 11% to 16%."

FAC ¶ 128 (quoting February 20, 2025 Q4 and FY 2024 Earnings Release).

- "Cardio & Vascular sales increased 24% in the second quarter 2025 compared to the second quarter 2024, driven by new product ramps in electrophysiology." FAC ¶ 148 (quoting July 24, 2025 Earnings Release).

Plaintiff fails to state a plausible claim for the following reasons:

First, the FAC does not allege any facts suggesting that any of the statements describing Integer's then-current or past performance were false. In fact statements describing EP as a "tailwind" for Integer were true when made: Integer's quarterly reports throughout the Class Period showed double-digit, year-over-year increases in C&V sales. Integer also met its forecasted projections for full-year 2025, including for C&V sales, notwithstanding the alleged manufacturing issues and the slowdown it predicted at its Q3 2025 earnings call for future 2026 sales. See Integer Feb. 23, 2026 Form 10-K at 38, ECF No. 44-13; see also Integer Oct. 23, 2025 Earnings Call Transcript at 18, ECF No. 44-2 (explaining that Integer still expected its C&V business to grow "per our previous guidance" through the end of 2025). There is nothing misleading about accurately reporting growth occurring despite the (alleged) existence of manufacturing issues when defendants never made any statements about the absence of manufacturing issues, Integer's production of PulseSelect devices, or the Juarez plant. See Wilbush v. Ambac Fin. Grp., Inc., 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) ("Accurate statements about past performance are self-evidently not actionable.").

Plaintiff may, accurately, believe that information about the manufacturing issues at the Juarez plant would have been material to a reasonable investor. But the federal securities laws "do not create an affirmative duty to disclose any and all material information," Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011); see In re ProShares Tr. Sec. Litig., 728 F.3d 96, 101 (2d Cir. 2013) ("[M]ateriality alone does not demand disclosure . . . ." (citation omitted)); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."). Here, plaintiff does not adequately allege that the identified statements were misleading in light of Integer's omission of the sought-after information because plaintiff fails to identify any statement where defendants stated, or "misleadingly suggest[ed]," that the alleged manufacturing issues at the Juarez plant or for the production of PulseSelect devices "did not exist." Chen v. Missfresh Ltd., 701 F. Supp. 3d 236, 254 (S.D.N.Y. 2023). Therefore, defendants' omission of those manufacturing issues was not misleading and plaintiff fails to state a plausible claim.

Second, many of the statements challenged in this category are inactionable puffery. See In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417-18 (2d Cir. 2023). These include statements describing EP and PFA as providing "tailwinds," FAC ¶¶ 110, 118, 121, 125, 135, 142, 144-45, 149, 141, describing the potential for "strong growth," id. ¶¶ 144-45, 149, and stating that Integer is "well-

positioned" to support its customers, id. ¶¶ 121, 135; see also, e.g., Robeco Cap. Growth Funds v. Peloton Interactive, Inc., 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (statements regarding "tailwind[s]" and "continued momentum" were "textbook cases of corporate optimism").

Plaintiff argues that these statements were not puffery because they were repeated throughout the Class Period and accompanied specific claims about Integer's growth. But, as noted above, plaintiff does not adequately allege that defendants' claims about Integer's growth, and what was driving Integer's growth, were false when made.[3] These statements therefore do not make defendants' discussion of "tailwinds" concrete in a misleading way. Rather, to the extent these statements were not simply true, they "are too general to cause a reasonable investor to rely upon them and thus cannot have mislead a reasonable investor." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (citation modified).

Third, many of the statements challenged in this category are quintessential forward-looking statements that describe Integer's "projection[s] of revenues" and "future economic performance." Slayton

[3] See, e.g., FAC ¶ 109 (July 25, 2024 statement that Integer's EP business is "growing at 1.5x the market growth rate" based on the company's "past 4 quarters"), id. ¶ 116 (September 4, 2024 statement that Integer's EP portfolio had been "growing at 1.5 times the market rate" over the past four quarters), id. ¶ 120 (October 24, 2024 statement that Integer's EP business was "still growing 1.5-ish times the end market growth rate on a trailing 4-quarter basis"), id. ¶ 125 (December 3, 2024 statement that "we've been growing 1.5 times the industry growth rate in electrophysiology"), id. ¶ 149 (July 24, 2025 statement that "[i]f you look at our trailing four quarter within C&V . . . we believe that we are outperforming the market").

v. Am. Exp. Co., 604 F.3d 758, 769 (2d Cir. 2010). Such statements are protected by the PSLRA's safe harbor when accompanied by meaningful cautionary language. See 15 U.S.C. § 78u-5(i)(l). Integer warned investors that "actual results" could "differ materially" from those stated or implied by its "forward-looking statements" and repeatedly directed investors to its SEC filings "for a discussion of the risk factors that could cause our results to differ materially." See, e.g., Integer Apr. 24, 2025 Earnings Call Transcript at 4, ECF No. 44-7.

Plaintiff argues that these cautionary statements are insufficient to qualify defendants for the PSLRA safe harbor because defendants did not "directly address exactly the risk that plaintiff[] claim[s] was not disclosed," In re Salix Pharms, Ltd., No. 14-cv-8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016), namely, the "already-occurring" manufacturing failures at the Juarez plant, Medtronic's "mass returns" of the PulseSelect product, and its "total cessation of orders." Opp. at 19 (emphasis omitted). The Court is not persuaded.

Defendants consistently disclosed as among potential risks to Integer's future financial performance "interruptions in [Integer's] manufacturing operations" and its "dependence upon a limited number of customers." Integer July 25, 2024 Form 10-Q at 30, ECF No. 44-3; see also, e.g., Integer Oct. 24, 2024 Earnings Call Transcript at 4, ECF No. 44-11; Integer Feb. 20, 2025 Form 10-K at 16-29, 35, ECF No. 44-1; Integer July 24, 2025 Form 10-Q at 34-35, ECF No. 44-4. And, in any event, as explained above, the FAC does not plausibly allege that

any of the problems identified in connection with the Juarez plant or Integer's production of PulseSelect devices had a meaningfully negative impact on Integer's performance. Integer's growth was consistent with its forecast every quarter during the Class Period, July 25, 2024 to September 4, 2025, notwithstanding plaintiff's allegations that the PulseSelect manufacturing and ordering problems began in mid-2024. See, e.g., Integer July 25, 2024 Earnings Call Transcript at 4, ECF No. 44-5; Integer Feb. 20, 2025 Earnings Call Transcript at 4, ECF No. 44-6; see also Integer Oct. 23, 2025 Earnings Call Transcript at 18, ECF No. 44-2 ("We don't expect an impact on [EP products] in 2025, and our C&V business is still expected to grow per our previous guidance . . . . that has not changed.").

Fourth, the FAC's allegations regarding the importance of PulseSelect to Integer, the manufacturing and ordering issues, and the effects on Integer's business, are not well-pleaded. Plaintiff alleges that Medtronic returned all 5,000 initial units produced due to purported defects, that Medtronic placed no orders for 2025, and that the Juarez plant, which was the exclusive manufacturer of the PulseSelect product, ceased production entirely in July 2025. FAC ¶¶ 73, 82-85. Thus, the PulseSelect device was allegedly "effectively dead" by "early 2025." Opp at 9.

However, (1) as explained above, Integer continued to hit all sales growth targets and forecasts throughout 2025, despite the fact that Intenger's allegedly most important product was "effectively dead" the whole year; (2) the FAC alleges that Medtronic "still lists

PulseSelect among its PFA products," FAC ¶ 81 n.5, even though the sole factory producing the devices has allegedly been closed since July 2025; and (3) when Integer announced a lower expected sales growth for 2026 due to lower than expected demand for three products, Integer clearly stated that production of those products was continuing.

Given that Integer continued to hit all above-market sales growth forecasts throughout 2025, that Medtronic lists PulseSelect as one of its PFA products, and that Integer stated production of the devices for which demand was lower than expected continued, plaintiff's allegation that Integer's business was critically dependent on the PulseSelect device and that manufacturing of the device ceased in July 2025, is not well pleaded.

2. Statements about Integer's diversification

Plaintiff also alleges that the repeated statement that "there's no single program that's a meaningful driver of the entire company" was false. FAC ¶¶ 110, 120, 133. Plaintiff's only evidence of falsity is its allegation that "Integer's growth was in fact largely dependent on a single program – PFA - and, particularly, on a single product, PulseSelect," as demonstrated by the adjustment in "sales growth for 2026" after "demand for that single product collapsed." Opp. 13; see FAC ¶ 134. Plaintiff fails to state a plausible claim.

First, Integer continued to hit all sales growth targets and forecasts in 2025 despite the fact that this single product line was, allegedly, "effectively dead" by early 2025. Second, Integer's other disclosures, which plaintiff does not challenge, show the company's

diversification across multiple product areas. See, e.g., Integer Feb. 20, 2025 10-K at 4-6, ECF No. 44-1. And third, when Integer reduced its guidance for projected sales growth in 2026, it attributed that decline to lower than expected "sales of three new products," including a non-EP product, not specifically to the PulseSelect product, as plaintiff suggests. See Integer Oct. 23, 2025 Earnings Call Transcript at 5, ECF No. 44-2 (emphasis added).

3. Statements about Integer's visibility into customer demand

Plaintiff also alleges that defendants' claims that they had "tremendous visibility" into customer demand based on a "very strong order book" was false. See FAC ¶¶ 36, 42, 51, 63, 114, 119, 137, 148, 165. Notably, plaintiff does not allege that any of the reported book numbers were false when made or that the existence of customer orders in those amounts did not in fact provide "visibility" into then-existing customer demand. The fact that Medtronic had not placed any new orders for PulseSelect devices by mid-2025, opp. at 14, did not make it misleading to say that the company had good visibility into customer demand and a strong order book. Plaintiff equates visibility into current orders and a strong existing order book with a guarantee that customers will keep placing large orders with Integer for the same products. But Integer never said or implied that. To the extent some statements about visibility were tied to statements about Integer's "sales outlook," see FAC ¶ 148, those were statements about

2025, and it is undisputed that Integer in fact hit all of its sales targets and forecasts for 2025 that Integer publicly stated.[4]

Similarly, the FAC alleges that defendants' statement that Integer had "not seen any material meaningful change in customer expectation," FAC ¶¶ 36, 42, was false because by mid-2025 Medtronic had not placed any new orders for PulseSelect, Opp. at 14. Plaintiff fails to state a plausible claim. The only time defendants allegedly stated that they had "not seen any material meaningful change in customer expectation" was in July 2024, on Integer's Q2 2024 earnings call. FAC ¶¶ 36, 42. July 2024 predates mid-2025 by a year. Integer's statement about changes in customer expectations and demand in July 2024 are not false or misleading due to changes in customer demand in mid-2025. See Klein v. Goetzmann, 745 F. Supp. 107, 111 (N.D.N.Y. 1990) ("Failure to accurately predict future business developments is generally not actionable under Section 10(b) and Rule 10b-5.") (citing cases).

**B. Scienter**

To make out a securities fraud claim, plaintiff must also plead "with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Scienter in a securities fraud case requires that the defendant acted with "an intent to deceive,

---

[4] For example, on April 24, 2025, defendants affirmed Integer's full year guidance for 2025 and stated that the $ 800 million order book provided a "fixed guarantee" of above-market growth through at least the end of 2025. FAC ¶ 51.

manipulate or defraud." In re Shanda Games Ltd. Sec. Litig., 128 F.4th at 51 (citation modified). "An inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. (citation modified). "A plaintiff may establish scienter with facts showing," id. at 51-52, "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness," Loc. 134 IBEW Joint Pension Tr. of Chi., 553 F.3d at 198. The FAC does not adequately allege scienter, which is an independent reason why the FAC fails to state a plausible claim.

To begin with, plaintiff does not adequately allege motive. Plaintiff argues that Dziedzic's sale of the vast majority of his Integer stock on May 1, 2025, demonstrates motive. "The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001). "'Unusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." Id. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. Although Dziedzic did sell nearly all of his Integer

stock for a large profit, other considerations undermine an inference of bad motive.

For one thing, Dziedzic's stock sale took place one week after Integer publicly announced his retirement. FAC ¶ 51. The most plausible inference is that he "sold his stock as a 'normal and expected' consequence of his retirement, not as part of a[] . . . conspiracy to defraud." City of Taylor Gen. Empls. Ret. Sys. v. Magna Int'l, Inc., 967 F. supp. 27, 771, 799 (S.D.N.Y. 2013). Additionally, Dziedzic's sale took place in the middle of the class period, nearly six months before what plaintiff alleges was the corrective disclosure, and before Dziedzic allegedly made additional false and misleading statements. See FAC ¶¶ 141, 148 (alleging materially false statements by Dziedzic in July 2025). Finally, the fact that none of the other Individual Defendants sold any Integer stock during the Class Period also undermines the inference that "negative information was withheld to obtain a higher sell price." In re Scholastic, 252 F.3d at 75.

Plaintiff does not allege sufficient circumstantial evidence of scienter either. In the absence of adequate allegations of motive, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." Set Capital LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 83 n.73 (2d Cir. 2021) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)). Plaintiffs principally rely on the allegations of the two former employees, arguing that defendants knew of the manufacturing issues at the Juarez plant and order issues for PulseSelect. Those allegations

alone, however, are not strong circumstantial evidence of "an intent to deceive, manipulate or defraud." In re Shanda Games Ltd. Sec. Litig., 128 F.4th at 51 (citation modified). They merely support the inference that defendants knew about the issues and decided not to voluntarily disclose them.

Moreover, none of Integer's reporting made specific statements about the success of the PulseSelect product or the Juarez plant. The former employees, who allegedly were "directly involved in the manufacture of Medtronic's [PulseSelect device]," FAC ¶ 155, are not alleged to have any knowledge related to sales or projections for Integer's full EP product line, its overall C&V portfolio (of which EP was just one part), or the company as a whole -- the topic of the defendants' statements. Thus, the two former employees are not circumstantial evidence that defendants "knew facts or had access to information suggesting that their public statements were not accurate." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

Therefore, the FAC fails to state a plausible claim for violation of section 10(b): the FAC does not adequately allege defendants made a false or misleading statement, and does not adequately allege that defendants had "an intent to deceive, manipulate or defraud." In re Shanda Games Ltd. Sec. Litig., 128 F.4th at 51 (citation modified).

### C. Plaintiff's Section 20(a) Claim

Because the FAC fails to state a plausible "securities-fraud claim under § 10(b) and Rule 10b-5," the FAC also fails to state a plausible "claim of control person liability under § 20(a)," which

requires plaintiff to show "a primary violation" under section 10(b). In re Shanda Games Ltd. Sec. Litig., 128 F.4th at 41, 59.

## IV. Conclusion

For the reasons set forth above, the motion to dismiss was granted. Because plaintiff has already amended its complaint and because there is no suggestion that plaintiff could cure the deficiencies identified above, the dismissal is with prejudice. The Clerk of Court is respectfully directed to enter final judgment.

SO ORDERED.

New York, NY
October 19, 2026

JED S. RAKOFF, U.S.D.J.